## GOSS ET AL. *v.* LOPEZ ET AL.

No. 73–898.   Argued October 16, 1974—Decided January 22, 1975

WHITE, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, and MARSHALL, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 584.

*Thomas A. Bustin* argued the cause for appellants. With him on the briefs were *James J. Hughes, Jr., Robert A. Bell,* and *Patrick M. McGrath.*

*Peter D. Roos* argued the cause for appellees. With him on the brief were *Denis Murphy* and *Kenneth C. Curtin.**

*\*John F. Lewis* filed a brief for the Buckeye Association of School Administrators et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *David Bonderman, Peter Van N. Lockwood, Paul L. Tractenberg, David Rubin,* and *W. William Hodes* for the National Committee for Citizens in Education et al.; by *Alan H. Levine, Melvin L. Wulf,* and *Joel M. Gora* for the American Civil Liberties Union; by *Robert H. Kapp, R. Stephen Browning,* and *Nathaniel R. Jones* for the National Association for the Advancement of Colored People et al.; and by *Marian Wright Edelman* for the Children's Defense Fund of the Washington Research Project, Inc., et al.

MR. JUSTICE WHITE delivered the opinion of the Court.

This appeal by various administrators of the Columbus, Ohio, Public School System (CPSS) challenges the judgment of a three-judge federal court, declaring that appellees—various high school students in the CPSS—were denied due process of law contrary to the command of the Fourteenth Amendment in that they were temporarily suspended from their high schools without a hearing either prior to suspension or within a reasonable time thereafter, and enjoining the administrators to remove all references to such suspensions from the students' records.

I

Ohio law, Rev. Code Ann. § 3313.64 (1972), provides for free education to all children between the ages of six and 21. Section 3313.66 of the Code empowers the principal of an Ohio public school to suspend a pupil for misconduct for up to 10 days or to expel him. In either case, he must notify the student's parents within 24 hours and state the reasons for his action. A pupil who is expelled, or his parents, may appeal the decision to the Board of Education and in connection therewith shall be permitted to be heard at the board meeting. The Board may reinstate the pupil following the hearing. No similar procedure is provided in § 3313.66 or any other provision of state law for a suspended student. Aside from a regulation tracking the statute, at the time of the imposition of the suspensions in this case the CPSS itself had not issued any written procedure applicable to suspensions.[1] Nor, so far as the record reflects, had any of

---

[1] At the time of the events involved in this case, the only administrative regulation on this subject was § 1010.04 of the Administrative Guide of the Columbus Public Schools which provided: "Pupils may be suspended or expelled from school in accordance with the provisions of Section 3313.66 of the Revised Code." Subse-

the individual high schools involved in this case.[2] Each, however, had formally or informally described the conduct for which suspension could be imposed.

The nine named appellees, each of whom alleged that he or she had been suspended from public high school in Columbus for up to 10 days without a hearing pursuant to § 3313.66, filed an action under 42 U. S. C. § 1983 against the Columbus Board of Education and various administrators of the CPSS. The complaint sought a

---

quent to the events involved in this lawsuit, the Department of Pupil Personnel of the CPSS issued three memoranda relating to suspension procedures, dated August 16, 1971, February 21, 1973, and July 10, 1973, respectively. The first two are substantially similar to each other and require no factfinding hearing at any time in connection with a suspension. The third, which was apparently in effect when this case was argued, places upon the principal the obligation to "investigate" "before commencing suspension procedures"; and provides as part of the procedures that the principal shall discuss the case with the pupil, so that the pupil may "be heard with respect to the alleged offense," unless the pupil is "unavailable" for such a discussion or "unwilling" to participate in it. The suspensions involved in this case occurred, and records thereof were made, prior to the effective date of these memoranda. The District Court's judgment, including its expunction order, turns on the propriety of the procedures existing at the time the suspensions were ordered and by which they were imposed.

[2] According to the testimony of Phillip Fulton, the principal of one of the high schools involved in this case, there was an informal procedure applicable at the Marion-Franklin High School. It provided that in the routine case of misconduct, occurring in the presence of a teacher, the teacher would describe the misconduct on a form provided for that purpose and would send the student, with the form, to the principal's office. There, the principal would obtain the student's version of the story, and, if it conflicted with the teacher's written version, would send for the teacher to obtain the teacher's oral version—apparently in the presence of the student. Mr. Fulton testified that, if a discrepancy still existed, the teacher's version would be believed and the principal would arrive at a disciplinary decision based on it.

declaration that § 3313.66 was unconstitutional in that it permitted public school administrators to deprive plaintiffs of their rights to an education without a hearing of any kind, in violation of the procedural due process component of the Fourteenth Amendment. It also sought to enjoin the public school officials from issuing future suspensions pursuant to § 3313.66 and to require them to remove references to the past suspensions from the records of the students in question.[3]

The proof below established that the suspensions arose out of a period of widespread student unrest in the CPSS during February and March 1971. Six of the named plaintiffs, Rudolph Sutton, Tyrone Washington, Susan Cooper, Deborah Fox, Clarence Byars, and Bruce Harris, were students at the Marion-Franklin High School and were each suspended for 10 days[4] on account of disruptive or disobedient conduct committed in the presence of the school administrator who ordered the suspension. One of these, Tyrone Washington, was among a group of students demonstrating in the school auditorium while a class was being conducted there. He was ordered by the school principal to leave, refused

---

[3] The plaintiffs sought to bring the action on behalf of all students of the Columbus Public Schools suspended on or after February 1971, and a class action was declared accordingly. Since the complaint sought to restrain the "enforcement" and "operation" of a state statute "by restraining the action of any officer of such state in the enforcement or execution of such statute," a three-judge court was requested pursuant to 28 U. S. C. § 2281 and convened. The students also alleged that the conduct for which they could be suspended was not adequately defined by Ohio law. This vagueness and overbreadth argument was rejected by the court below and the students have not appealed from this part of the court's decision.

[4] Fox was given two separate 10-day suspensions for misconduct occurring on two separate occasions—the second following immediately upon her return to school. In addition to his suspension, Sutton was transferred to another school.

to do so, and was suspended. Rudolph Sutton, in the presence of the principal, physically attacked a police officer who was attempting to remove Tyrone Washington from the auditorium. He was immediately suspended. The other four Marion-Franklin students were suspended for similar conduct. None was given a hearing to determine the operative facts underlying the suspension, but each, together with his or her parents, was offered the opportunity to attend a conference, subsequent to the effective date of the suspension, to discuss the student's future.

Two named plaintiffs, Dwight Lopez and Betty Crome, were students at the Central High School and McGuffey Junior High School, respectively. The former was suspended in connection with a disturbance in the lunchroom which involved some physical damage to school property.[5] Lopez testified that at least 75 other students were suspended from his school on the same day. He also testified below that he was not a party to the destructive conduct but was instead an innocent bystander. Because no one from the school testified with regard to this incident, there is no evidence in the record indicating the official basis for concluding otherwise. Lopez never had a hearing.

Betty Crome was present at a demonstration at a high school other than the one she was attending. There she was arrested together with others, taken to the police station, and released without being formally charged. Before she went to school on the following day, she was

---

[5] Lopez was actually absent from school, following his suspension, for over 20 days. This seems to have occurred because of a misunderstanding as to the length of the suspension. A letter sent to Lopez after he had been out for over 10 days purports to assume that, being over compulsory school age, he was voluntarily staying away. Upon asserting that this was not the case, Lopez was transferred to another school.

notified that she had been suspended for a 10-day period. Because no one from the school testified with respect to this incident, the record does not disclose how the Mc-Guffey Junior High School principal went about making the decision to suspend Crome, nor does it disclose on what information the decision was based. It is clear from the record that no hearing was ever held.

There was no testimony with respect to the suspension of the ninth named plaintiff, Carl Smith. The school files were also silent as to his suspension, although as to some, but not all, of the other named plaintiffs the files contained either direct references to their suspensions or copies of letters sent to their parents advising them of the suspension.

On the basis of this evidence, the three-judge court declared that plaintiffs were denied due process of law because they were "suspended without hearing prior to suspension or within a reasonable time thereafter," and that Ohio Rev. Code Ann. § 3313.66 (1972) and regulations issued pursuant thereto were unconstitutional in permitting such suspensions.[6] It was ordered that all references to plaintiffs' suspensions be removed from school files.

Although not imposing upon the Ohio school administrators any particular disciplinary procedures and leaving them "free to adopt regulations providing for fair suspension procedures which are consonant with the educational goals of their schools and reflective of the characteristics of their school and locality," the District Court declared

---

[6] In its judgment, the court stated that the statute is unconstitutional in that it provides "for suspension . . . without *first* affording the student due process of law." (Emphasis supplied.) However, the language of the judgment must be read in light of the language in the opinion which expressly contemplates that under some circumstances students may properly be removed from school before a hearing is held, so long as the hearing follows promptly.

that there were "minimum requirements of notice and a hearing prior to suspension, except in emergency situations." In explication, the court stated that relevant case authority would: (1) permit "[i]mmediate removal of a student whose conduct disrupts the academic atmosphere of the school, endangers fellow students, teachers or school officials, or damages property"; (2) require notice of suspension proceedings to be sent to the student's parents within 24 hours of the decision to conduct them; and (3) require a hearing to be held, with the student present, within 72 hours of his removal. Finally, the court stated that, with respect to the nature of the hearing, the relevant cases required that statements in support of the charge be produced, that the student and others be permitted to make statements in defense or mitigation, and that the school need not permit attendance by counsel.

The defendant school administrators have appealed the three-judge court's decision. Because the order below granted plaintiffs' request for an injunction—ordering defendants to expunge their records—this Court has jurisdiction of the appeal pursuant to 28 U. S. C. § 1253. We affirm.

## II

At the outset, appellants contend that because there is no constitutional right to an education at public expense, the Due Process Clause does not protect against expulsions from the public school system. This position misconceives the nature of the issue and is refuted by prior decisions. The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law. Protected interests in property are normally "not created by the Constitution. Rather, they are created and their dimensions are defined" by an independent source such as state statutes or rules

entitling the citizen to certain benefits. *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972).

Accordingly, a state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process. *Connell* v. *Higginbotham,* 403 U. S. 207 (1971); *Wieman* v. *Updegraff,* 344 U. S. 183, 191–192 (1952); *Arnett* v. *Kennedy,* 416 U. S. 134, 164 (POWELL, J., concurring), 171 (WHITE, J., concurring and dissenting) (1974). So may welfare recipients who have statutory rights to welfare as long as they maintain the specified qualifications. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970). *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), applied the limitations of the Due Process Clause to governmental decisions to revoke parole, although a parolee has no constitutional right to that status. In like vein was *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), where the procedural protections of the Due Process Clause were triggered by official cancellation of a prisoner's good-time credits accumulated under state law, although those benefits were not mandated by the Constitution.

Here, on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education. Ohio Rev. Code Ann. §§ 3313.48 and 3313.64 (1972 and Supp. 1973) direct local authorities to provide a free education to all residents between five and 21 years of age, and a compulsory-attendance law requires attendance for a school year of not less than 32 weeks. Ohio Rev. Code Ann. § 3321.04 (1972). It is true that § 3313.66 of the Code permits school principals to suspend students for up to 10 days; but suspensions may not be imposed without any grounds whatsoever. All of the schools had their own rules specifying the

grounds for expulsion or suspension. Having chosen to extend the right to an education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred. *Arnett* v. *Kennedy, supra,* at 164 (POWELL, J., concurring), 171 (WHITE, J., concurring and dissenting), 206 (MARSHALL, J., dissenting).

Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend. Those young people do not "shed their constitutional rights" at the schoolhouse door. *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 506 (1969). "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 637 (1943). The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.

The Due Process Clause also forbids arbitrary deprivations of liberty. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of the Clause must be satisfied. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971); *Board of Regents* v. *Roth, supra,* at 573. School authorities here suspended appellees from school for periods of up to 10 days

based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.[7] It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution.

Appellants proceed to argue that even if there is a right to a public education protected by the Due Process Clause generally, the Clause comes into play only when the State subjects a student to a "severe detriment or grievous loss." The loss of 10 days, it is said, is neither severe nor grievous and the Due Process Clause is therefore of no relevance. Appellants' argument is again refuted by our prior decisions; for in determining "whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest

---

[7] Appellees assert in their brief that four of 12 randomly selected Ohio colleges specifically inquire of the high school of every applicant for admission whether the applicant has ever been suspended. Brief for Appellees 34–35 and n. 40. Appellees also contend that many employers request similar information. *Ibid.*

Congress has recently enacted legislation limiting access to information contained in the files of a school receiving federal funds. Section 513 of the Education Amendments of 1974, Pub. L. 93–380, 88 Stat. 571, 20 U. S. C. § 1232g (1970 ed., Supp. IV), adding § 438 to the General Education Provisions Act. That section would preclude release of "verified reports of serious or recurrent behavior patterns" to employers without written consent of the student's parents. While subsection (b)(1)(B) permits release of such information to "other schools . . . in which the student intends to enroll," it does so only upon condition that the parent be advised of the release of the information and be given an opportunity at a hearing to challenge the content of the information to insure against inclusion of inaccurate or misleading information. The statute does not expressly state whether the parent can contest the underlying basis for a suspension, the fact of which is contained in the student's school record.

at stake." *Board of Regents* v. *Roth, supra,* at 570–571. Appellees were excluded from school only temporarily, it is true, but the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, "is not decisive of the basic right" to a hearing of some kind. *Fuentes* v. *Shevin,* 407 U. S. 67, 86 (1972). The Court's view has been that as long as a property deprivation is not *de minimis,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause. *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337, 342 (1969) (Harlan, J., concurring); *Boddie* v. *Connecticut,* 401 U. S. 371, 378–379 (1971); *Board of Regents* v. *Roth, supra,* at 570 n. 8. A 10-day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause.

A short suspension is, of course, a far milder deprivation than expulsion. But, "education is perhaps the most important function of state and local governments," *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954), and the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.[8]

---

[8] Since the landmark decision of the Court of Appeals for the Fifth Circuit in *Dixon* v. *Alabama State Board of Education,* 294 F. 2d 150, cert. denied, 368 U. S. 930 (1961), the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion. *Hagopian* v. *Knowlton,* 470 F. 2d 201, 211 (CA2 1972); *Wasson* v. *Trowbridge,* 382 F. 2d 807, 812 (CA2 1967);

## III

"Once it is determined that due process applies, the question remains what process is due." *Morrissey* v. *Brewer*, 408 U. S., at 481. We turn to that question, fully

---

*Esteban* v. *Central Missouri State College*, 415 F. 2d 1077, 1089 (CA8 1969), cert. denied, 398 U. S. 965 (1970); *Vought* v. *Van Buren Public Schools*, 306 F. Supp. 1388 (ED Mich. 1969); *Whitfield* v. *Simpson*, 312 F. Supp. 889 (ED Ill. 1970); *Fielder* v. *Board of Education of School District of Winnebago, Neb.*, 346 F. Supp. 722, 729 (Neb. 1972); *DeJesus* v. *Penberthy*, 344 F. Supp. 70, 74 (Conn. 1972); *Soglin* v. *Kauffman*, 295 F. Supp. 978, 994 (WD Wis. 1968), aff'd, 418 F. 2d 163 (CA7 1969); *Stricklin* v. *Regents of University of Wisconsin*, 297 F. Supp. 416, 420 (WD Wis. 1969), appeal dismissed, 420 F. 2d 1257 (CA7 1970); *Buck* v. *Carter*, 308 F. Supp. 1246 (WD Wis. 1970); General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F. R. D. 133, 147–148 (WD Mo. 1968) (en banc). The lower courts have been less uniform, however, on the question whether removal from school for some shorter period may ever be so trivial a deprivation as to require no process, and, if so, how short the removal must be to qualify. Courts of Appeals have held or assumed the Due Process Clause applicable to long suspensions, *Pervis* v. *LaMarque Ind. School Dist.*, 466 F. 2d 1054 (CA5 1972); to indefinite suspensions, *Sullivan* v. *Houston Ind. School Dist.*, 475 F. 2d 1071 (CA5), cert. denied, 414 U. S. 1032 (1973); to the addition of a 30-day suspension to a 10-day suspension, *Williams* v. *Dade County School Board*, 441 F. 2d 299 (CA5 1971); to a 10-day suspension, *Black Students of North Fort Myers Jr.-Sr. High School* v. *Williams*, 470 F. 2d 957 (CA5 1972); to "mild" suspensions, *Farrell* v. *Joel*, 437 F. 2d 160 (CA2 1971), and *Tate* v. *Board of Education*, 453 F. 2d 975 (CA8 1972); and to a three-day suspension, *Shanley* v. *Northeast Ind. School Dist., Bexar County, Texas*, 462 F. 2d 960, 967 n. 4 (CA5 1972); but inapplicable to a seven-day suspension, *Linwood* v. *Board of Ed. of City of Peoria*, 463 F. 2d 763 (CA7), cert. denied, 409 U. S. 1027 (1972); to a three-day suspension, *Dunn* v. *Tyler Ind. School Dist.*, 460 F. 2d 137 (CA5 1972); to a suspension for not "more than a few days," *Murray* v. *West Baton Rouge Parish School Board*, 472 F. 2d 438 (CA5 1973); and to all suspensions no matter how short, *Black Coalition* v. *Portland School District No. 1*,

realizing as our cases regularly do that the interpretation and application of the Due Process Clause are intensely practical matters and that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). We are also mindful of our own admonition:

> "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968).

There are certain bench marks to guide us, however. *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306

484 F. 2d 1040 (CA9 1973). The Federal District Courts have held the Due Process Clause applicable to an interim suspension pending expulsion proceedings in *Stricklin* v. *Regents of University of Wisconsin, supra,* and *Buck* v. *Carter, supra;* to a 10-day suspension, *Banks* v. *Board of Public Instruction of Dade County,* 314 F. Supp. 285 (SD Fla. 1970), vacated, 401 U. S. 988 (1971) (for entry of a fresh decree so that a timely appeal might be taken to the Court of Appeals), aff'd, 450 F. 2d 1103 (CA5 1971); to suspensions of under five days, *Vail* v. *Board of Education of Portsmouth School Dist.,* 354 F. Supp. 592 (NH 1973); and to all suspensions, *Mills* v. *Board of Education of the Dist. of Columbia,* 348 F. Supp. 866 (DC 1972), and *Givens* v. *Poe,* 346 F. Supp. 202 (WDNC 1972); but inapplicable to suspensions of 25 days, *Hernandez* v. *School District Number One, Denver, Colorado,* 315 F. Supp. 289 (Colo. 1970); to suspensions of 10 days, *Baker* v. *Downey City Board of Education,* 307 F. Supp. 517 (CD Cal. 1969); and to suspensions of eight days, *Hatter* v. *Los Angeles City High School District,* 310 F. Supp. 1309 (CD Cal. 1970), rev'd on other grounds, 452 F. 2d 673 (CA9 1971). In the cases holding no process necessary in connection with short suspensions, it is not always clear whether the court viewed the Due Process Clause as inapplicable, or simply felt that the process received was "due" even in the absence of some kind of hearing procedure.

(1950), a case often invoked by later opinions, said that "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.,* at 313. "The fundamental requisite of due process of law is the opportunity to be heard," *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914), a right that "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest." *Mullane* v. *Central Hanover Trust Co., supra,* at 314. See also *Armstrong* v. *Manzo,* 380 U. S. 545, 550 (1965); *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 168–169 (1951) (Frankfurter, J., concurring). At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given *some* kind of notice and afforded *some* kind of hearing. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin* v. *Hale,* 1 Wall. 223, 233 (1864).

It also appears from our cases that the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved. *Cafeteria Workers* v. *McElroy, supra,* at 895; *Morrissey* v. *Brewer, supra,* at 481. The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. The Due Process Clause will not shield him from suspensions properly imposed, but it disserves both his interest and the interest of the State if his suspension is in fact unwarranted. The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never

unfair. Unfortunately, that is not the case, and no one suggests that it is. Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.

The difficulty is that our schools are vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device. The prospect of imposing elaborate hearing requirements in every suspension case is viewed with great concern, and many school authorities may well prefer the untrammeled power to act unilaterally, unhampered by rules about notice and hearing. But it would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done. "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . ." "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Anti-Fascist Committee* v. *McGrath, supra,* at 170, 171–172 (Frankfurter, J., concurring).[9]

---

[9] The facts involved in this case illustrate the point. Betty Crome was suspended for conduct which did not occur on school grounds, and for which mass arrests were made—hardly guaranteeing careful

We do not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.[10]

individualized factfinding by the police or by the school principal. She claims to have been involved in no misconduct. However, she was suspended for 10 days without ever being told what she was accused of doing or being given an opportunity to explain her presence among those arrested. Similarly, Dwight Lopez was suspended, along with many others, in connection with a disturbance in the lunchroom. Lopez says he was not one of those in the lunchroom who was involved. However, he was never told the basis for the principal's belief that he was involved, nor was he ever given an opportunity to explain his presence in the lunchroom. The school principals who suspended Crome and Lopez may have been correct on the merits, but it is inconsistent with the Due Process Clause to have made the decision that misconduct had occurred without at some meaningful time giving Crome or Lopez an opportunity to persuade the principals otherwise.

We recognize that both suspensions were imposed during a time of great difficulty for the school administrations involved. At least in Lopez' case there may have been an immediate need to send home everyone in the lunchroom in order to preserve school order and property; and the administrative burden of providing 75 "hearings" of any kind is considerable. However, neither factor justifies a disciplinary suspension without *at any time* gathering facts relating to Lopez specifically, confronting him with them, and giving him an opportunity to explain.

[10] Appellants point to the fact that some process is provided under Ohio law by way of judicial review. Ohio Rev. Code Ann. § 2506.01

There need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is. Lower courts which have addressed the question of the *nature* of the procedures required in short suspension cases have reached the same conclusion. *Tate* v. *Board of Education,* 453 F. 2d 975, 979 (CA8 1972); *Vail* v. *Board of Education,* 354 F. Supp. 592, 603 (NH 1973). Since the hearing may occur almost immediately following the misconduct, it follows that as a general rule notice and hearing should precede removal of the student from school. We agree with the District Court, however, that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should fol-

---

(Supp. 1973). Appellants do not cite any case in which this general administrative review statute has been used to appeal from a disciplinary decision by a school official. If it be assumed that it could be so used, it is for two reasons insufficient to save inadequate procedures at the school level. First, although new proof may be offered in a § 2501.06 proceeding, *Shaker Coventry Corp.* v. *Shaker Heights Planning Comm'n,* 18 Ohio Op. 2d 272, 176 N. E. 2d 332 (1961), the proceeding is not *de novo. In re Locke,* 33 Ohio App. 2d 177, 294 N. E. 2d 230 (1972). Thus the decision by the school—even if made upon inadequate procedures—is entitled to weight in the court proceeding. Second, without a demonstration to the contrary, we must assume that delay will attend any § 2501.06 proceeding, that the suspension will not be stayed pending hearing, and that the student meanwhile will irreparably lose his educational benefits.

low as soon as practicable, as the District Court indicated.

In holding as we do, we do not believe that we have imposed procedures on school disciplinarians which are inappropriate in a classroom setting. Instead we have imposed requirements which are, if anything, less than a fair-minded school principal would impose upon himself in order to avoid unfair suspensions. Indeed, according to the testimony of the principal of Marion-Franklin High School, that school had an informal procedure, remarkably similar to that which we now require, applicable to suspensions generally but which was not followed in this case. Similarly, according to the most recent memorandum applicable to the entire CPSS, see n. 1, *supra*, school principals in the CPSS are now required by local rule to provide at least as much as the constitutional minimum which we have described.

We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. Brief disciplinary suspensions are almost countless. To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness. Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

On the other hand, requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and argu-

ments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced.

Requiring that there be at least an informal give-and-take between student and disciplinarian, preferably prior to the suspension, will add little to the factfinding function where the disciplinarian himself has witnessed the conduct forming the basis for the charge. But things are not always as they seem to be, and the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context.

We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required.

## IV

The District Court found each of the suspensions involved here to have occurred without a hearing, either before or after the suspension, and that each suspension was therefore invalid and the statute unconstitutional insofar as it permits such suspensions without notice or hearing. Accordingly, the judgment is

*Affirmed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

The Court today invalidates an Ohio statute that permits student suspensions from school without a hearing

"for not more than ten days." [1]   The decision unnecessarily opens avenues for judicial intervention in the operation of our public schools that may affect adversely the quality of education.   The Court holds for the first time that the federal courts, rather than educational officials and state legislatures, have the authority to determine the rules applicable to routine classroom discipline of children and teenagers in the public schools.   It justifies this unprecedented intrusion into the process of elementary and secondary education by identifying a new constitutional right: the right of a student not to be suspended for as much as a single day without notice and a due process hearing either before or promptly following the suspension. [2]

The Court's decision rests on the premise that, under Ohio law, education is a property interest protected by the Fourteenth Amendment's Due Process Clause and therefore that any suspension requires notice and a hearing. [3]   In my view, a student's interest in education is

---

[1] The Ohio statute, Ohio Rev. Code Ann. § 3313.66 (1972), actually is a limitation on the time-honored practice of school authorities themselves determining the appropriate duration of suspensions.   The statute allows the superintendent or principal of a public school to suspend a pupil "for *not more than ten days* . . ." (italics supplied); and requires notification to the parent or guardian in writing within 24 hours of any suspension.

[2] Section 3313.66 also provides authority for the expulsion of pupils, but requires a hearing thereon by the school board upon request of a parent or guardian.   The rights of pupils expelled are not involved in this case, which concerns only the limited discretion of school authorities to suspend for not more than 10 days.   Expulsion, usually resulting at least in loss of a school year or semester, is an incomparably more serious matter than the brief suspension, traditionally used as the principal sanction for enforcing routine discipline.   The Ohio statute recognizes this distinction.

[3] The Court speaks of "exclusion from the educational process for more than a trivial period . . . ," *ante,* at 576, but its opinion makes clear that even one day's suspension invokes the constitutional procedure mandated today.

not infringed by a suspension within the limited period prescribed by Ohio law. Moreover, to the extent that there may be some arguable infringement, it is too speculative, transitory, and insubstantial to justify imposition of a *constitutional* rule.

## I

Although we held in *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 35 (1973), that education is not a right protected by the Constitution, Ohio has elected by statute to provide free education for all youths age six to 21, Ohio Rev. Code Ann. §§ 3313.48, 3313.64 (1972 and Supp. 1973), with children under 18 years of age being compelled to attend school. § 3321.01 *et seq.* State law, therefore, extends the right of free public school education to Ohio students in accordance with the education laws of that State. The right or entitlement to education so created is protected in a proper case by the Due Process Clause. See, *e. g., Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Arnett* v. *Kennedy,* 416 U. S. 134, 164 (1974) (POWELL, J., concurring). In my view, this is not such a case.

In identifying property interests subject to due process protections, the Court's past opinions make clear that these interests "are created and their *dimensions are defined* by existing rules or understandings that stem from an independent source such as state law." *Board of Regents* v. *Roth, supra,* at 577 (emphasis supplied). The Ohio statute that creates the right to a "free" education also explicitly authorizes a principal to suspend a student for as much as 10 days. Ohio Rev. Code Ann. §§ 3313.48, 3313.64, 3313.66 (1972 and Supp. 1973). Thus the very legislation which "defines" the "dimension" of the student's entitlement, while providing a right to education generally, does not establish this right free of discipline imposed in accord with Ohio law. Rather, the right is

encompassed in the entire package of statutory provisions governing education in Ohio—of which the power to suspend is one.

The Court thus disregards the basic structure of Ohio law in posturing this case as if Ohio had conferred an unqualified right to education, thereby compelling the school authorities to conform to due process procedures in imposing the most routine discipline.[4]

But however one may define the entitlement to education provided by Ohio law, I would conclude that a deprivation of not more than 10 days' suspension from school, imposed as a routine disciplinary measure, does not assume constitutional dimensions. Contrary to the Court's assertion, our cases support rather than "refute" appel-

---

[4] The Court apparently reads into Ohio law by implication a qualification that suspensions may be imposed only for "cause," thereby analogizing this case to the civil service laws considered in *Arnett* v. *Kennedy,* 416 U. S. 134 (1974). To be sure, one may assume that pupils are not suspended at the whim or caprice of the school official, and the statute does provide for notice of the suspension with the "reasons therefor." But the same statute draws a sharp distinction between suspension and the far more drastic sanction of expulsion. A hearing is required only for the latter. To follow the Court's analysis, one must conclude that the legislature nevertheless intended—without saying so—that suspension also is of such consequence that it may be imposed only for causes which can be justified at a hearing. The unsoundness of reading this sort of requirement into the statute is apparent from a comparison with *Arnett.* In that case, Congress *expressly* provided that nonprobationary federal employees should be discharged only for "cause." This requirement reflected congressional recognition of the seriousness of discharging such employees. There simply is no analogy between *termination* of nonprobationary employment of a civil service employee and the *suspension* of a public school pupil for not more than 10 days. Even if the Court is correct in implying some concept of justifiable cause in the Ohio procedure, it could hardly be stretched to the constitutional proportions found present in *Arnett.*

lants' argument that "the Due Process Clause . . . comes into play only when the State subjects a student to a 'severe detriment or grievous loss.'" *Ante,* at 575. Recently, the Court reiterated precisely this standard for analyzing due process claims:

"Whether *any* procedural protections are due depends on the extent to which an individual will be 'condemned to suffer *grievous* loss.' *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), quoted in *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970)." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972) (emphasis supplied).

In *Morrissey* we applied that standard to require due process procedures for parole revocation on the ground that revocation "inflicts a 'grievous loss' on the parolee and often on others." *Id.,* at 482. See also *Board of Regents* v. *Roth,* 408 U. S., at 573 ("seriously damage" reputation and standing); *Bell* v. *Burson,* 402 U. S. 535, 539 (1971) ("important interests of the licensees"); *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971) ("significant property interest").[5]

The Ohio suspension statute allows no serious or sig-

---

[5] Indeed, the Court itself quotes from a portion of Mr. Justice Frankfurter's concurrence in *Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 171 (1951), which explicitly refers to "a person in jeopardy of *serious loss.*" See *ante,* at 580 (emphasis supplied).

Nor is the *"de minimis"* standard referred to by the Court relevant in this case. That standard was first stated by Mr. Justice Harlan in a concurring opinion in *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337, 342 (1969), and then quoted in a footnote to the Court's opinion in *Fuentes* v. *Shevin,* 407 U. S. 67, 90 n. 21 (1972). Both *Sniadach* and *Fuentes,* however, involved resolution of property disputes between two private parties claiming an interest in the same property. Neither case pertained to an interest conferred by the State.

nificant infringement of education. It authorizes only a maximum suspension of eight school days, less than 5% of the normal 180-day school year. Absences of such limited duration will rarely affect a pupil's opportunity to learn or his scholastic performance. Indeed, the record in this case reflects no educational injury to appellees. Each completed the semester in which the suspension occurred and performed at least as well as he or she had in previous years.[6] Despite the Court's unsupported speculation that a suspended student could be "seriously damage[d]" (*ante*, at 575), there is no factual showing of any such damage to appellees.

The Court also relies on a perceived deprivation of "liberty" resulting from any suspension, arguing—again without factual support in the record pertaining to these appellees—that a suspension harms a student's reputation. In view of the Court's decision in *Board of Regents* v. *Roth, supra,* I would have thought that this argument was plainly untenable. Underscoring the need for "serious damage" to reputation, the *Roth* Court held that a nontenured teacher who is not rehired by a public university could not claim to suffer sufficient reputational injury to require constitutional protections.[7] Surely a brief suspension is of less serious consequence to the reputation of a teenage student.

## II

In prior decisions, this Court has explicitly recognized that school authorities must have broad discretionary au-

[6] 2 App. 163–171 (testimony of Norval Goss, Director of Pupil Personnel). See opinion of the three-judge court, 372 F. Supp. 1279, 1291 (SD Ohio 1973).

[7] See also *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971), quoting the "grievous loss" standard first articulated in *Anti-Fascist Committee* v. *McGrath, supra.*

thority in the daily operation of public schools. This includes wide latitude with respect to maintaining discipline and good order. Addressing this point specifically, the Court stated in *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 507 (1969):

> "[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." [8]

Such an approach properly recognizes the unique nature of public education and the correspondingly limited role of the judiciary in its supervision. In *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968), the Court stated:

> "By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."

The Court today turns its back on these precedents. It can hardly seriously be claimed that a school principal's decision to suspend a pupil for a single day would "directly and sharply implicate basic constitutional values." *Ibid.*

Moreover, the Court ignores the experience of mankind, as well as the long history of our law, recognizing

---

[8] In dissent on the First Amendment issue, Mr. Justice Harlan recognized the Court's basic agreement on the limited role of the judiciary in overseeing school disciplinary decisions:

"I am reluctant to believe that there is any disagreement between the majority and myself on the proposition that school officials should be accorded the widest authority in maintaining discipline and good order in their institutions." 393 U. S., at 526.

that there *are* differences which must be accommodated in determining the rights and duties of children as compared with those of adults. Examples of this distinction abound in our law: in contracts, in torts, in criminal law and procedure, in criminal sanctions and rehabilitation, and in the right to vote and to hold office. Until today, and except in the special context of the First Amendment issue in *Tinker,* the educational rights of children and teenagers in the elementary and secondary schools have not been analogized to the rights of adults or to those accorded college students. Even with respect to the First Amendment, the rights of children have not been regarded as "co-extensive with those of adults." *Tinker, supra,* at 515 (STEWART, J., concurring).

## A

I turn now to some of the considerations which support the Court's former view regarding the comprehensive authority of the States and school officials "to prescribe and control conduct in the schools." *Id.,* at 507. Unlike the divergent and even sharp conflict of interests usually present where due process rights are asserted, the interests here implicated—of the State through its schools and of the pupils—are essentially congruent.

The State's interest, broadly put, is in the proper functioning of its public school system for the benefit of *all* pupils and the public generally. Few rulings would interfere more extensively in the daily functioning of schools than subjecting routine discipline to the formalities and judicial oversight of due process. Suspensions are one of the traditional means—ranging from keeping a student after class to permanent expulsion—used to maintain discipline in the schools. It is common knowledge that maintaining order and reasonable de-

corum in school buildings and classrooms is a major educational problem, and one which has increased significantly in magnitude in recent years.[9] Often the teacher, in protecting the rights of other children to an education (if not his or their safety), is compelled to rely on the power to suspend.

The facts set forth in the margin [10] leave little room for doubt as to the magnitude of the disciplinary problem in the public schools, or as to the extent of reliance upon the right to suspend. They also demonstrate that if hearings were required for a substantial percentage of short-term suspensions, school authorities would have time to do little else.

B

The State's generalized interest in maintaining an orderly school system is not incompatible with the indi-

[9] See generally S. Bailey, Disruption in Urban Secondary Schools (1970), which summarizes some of the recent surveys on school disruption. A Syracuse University study, for example, found that 85% of the schools responding reported some type of significant disruption in the years 1967–1970.

[10] An *amicus* brief filed by the Children's Defense Fund states that *at least 10%* of the junior and senior high school students in the States sampled were suspended *one or more* times in the 1972–1973 school year. The data on which this conclusion rests were obtained from an extensive survey prepared by the Office for Civil Rights of the Department of Health, Education, and Welfare. The Children's Defense Fund reviewed the suspension data for five States—Arkansas, Maryland, New Jersey, Ohio, and South Carolina.

Likewise, an *amicus* brief submitted by several school associations in Ohio indicates that the number of suspensions is significant: in 1972–1973, 4,054 students out of a school enrollment of 81,007 were suspended in Cincinnati; 7,352 of 57,000 students were suspended in Akron; and 14,598 of 142,053 students were suspended in Cleveland. See also the Office of Civil Rights Survey, *supra,* finding that approximately 20,000 students in New York City, 12,000 in Cleveland, 9,000 in Houston, and 9,000 in Memphis were suspended at least once during the 1972–1973 school year. Even these figures are probably somewhat conservative since some schools did not reply to the survey.

vidual interest of the student. Education in any meaningful sense includes the inculcation of an understanding in each pupil of the necessity of rules and obedience thereto. This understanding is no less important than learning to read and write. One who does not comprehend the meaning and necessity of discipline is handicapped not merely in his education but throughout his subsequent life. In an age when the home and church play a diminishing role in shaping the character and value judgments of the young, a heavier responsibility falls upon the schools. When an immature student merits censure for his conduct, he is rendered a disservice if appropriate sanctions are not applied or if procedures for their application are so formalized as to invite a challenge to the teacher's authority [11]—an invitation which rebellious or even merely spirited teenagers are likely to accept.

The lesson of discipline is not merely a matter of the student's self-interest in the shaping of his own character and personality; it provides an early understanding of the relevance to the social compact of respect for the rights of others. The classroom is the laboratory in which this lesson of life is best learned. Mr. Justice Black summed it up:

> "School discipline, like parental discipline, is an integral and important part of training our children to be good citizens—to be better citizens." *Tinker,* 393 U. S., at 524 (dissenting opinion).

In assessing in constitutional terms the need to protect pupils from unfair minor discipline by school authorities, the Court ignores the commonality of interest of the State and pupils in the public school system. Rather, it thinks in traditional judicial terms of an adversary

---

[11] See generally J. Dobson, Dare to Discipline (1970).

594

situation. To be sure, there will be the occasional pupil innocent of any rule infringement who is mistakenly suspended or whose infraction is too minor to justify suspension. But, while there is no evidence indicating the frequency of unjust suspensions, common sense suggests that they will not be numerous in relation to the total number, and that mistakes or injustices will usually be righted by informal means.

## C

One of the more disturbing aspects of today's decision is its indiscriminate reliance upon the judiciary, and the adversary process, as the means of resolving many of the most routine problems arising in the classroom. In mandating due process procedures the Court misapprehends the reality of the normal teacher-pupil relationship. There is an ongoing relationship, one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute.[12] It is rarely adversary in nature except with respect to the chronically disruptive or insubordinate pupil whom the teacher must be free to discipline without frustrating formalities.[13]

---

[12] The role of the teacher in our society historically has been an honored and respected one, rooted in the experience of decades that has left for most of us warm memories of our teachers, especially those of the formative years of primary and secondary education.

[13] In this regard, the relationship between a student and teacher is manifestly different from that between a welfare administrator and a recipient (see *Goldberg* v. *Kelly*, 397 U. S. 254 (1970)), a motor vehicle department and a driver (see *Bell* v. *Burson*, 402 U. S. 535 (1971)), a debtor and a creditor (see *Sniadach* v. *Family Finance Corp., supra; Fuentes* v. *Shevin, supra; Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600 (1974)), a parole officer and a parolee (see *Morrissey* v. *Brewer*, 408 U. S. 471 (1972)), or even an employer and an employee (see *Arnett* v. *Kennedy*, 416 U. S. 134 (1974)). In many of these noneducation settings there is—for purposes of this analy-

The Ohio statute, providing as it does for due notice both to parents and the Board, is compatible with the teacher-pupil relationship and the informal resolution of mistaken disciplinary action. We have relied for generations upon the experience, good faith and dedication of those who staff our public schools,[14] and the nonadversary means of airing grievances that always have been available to pupils and their parents. One would have thought before today's opinion that this informal method of resolving differences was more compatible with the interests of all concerned than resort to any constitutionalized procedure, however blandly it may be defined by the Court.

### D

In my view, the constitutionalizing of routine classroom decisions not only represents a significant and unwise extension of the Due Process Clause, but it also was quite unnecessary in view of the safeguards prescribed by the Ohio statute. This is demonstrable from a com-

---

sis—a "faceless" administrator dealing with an equally "faceless" recipient of some form of government benefit or license; in others, such as the garnishment and repossession cases, there is a conflict-of-interest relationship. Our public school system, however, is premised on the belief that teachers and pupils should not be "faceless" to each other. Nor does the educational relationship present a typical "conflict of interest." Rather, the relationship traditionally is marked by a coincidence of interests.

Yet the Court, relying on cases such as *Sniadach* and *Fuentes,* apparently views the classroom of teenagers as comparable to the competitive and adversary environment of the adult, commercial world.

[14] A traditional factor in any due process analysis is "the protection implicit in the office of the functionary whose conduct is challenged . . . ." *Anti-Fascist Committee* v. *McGrath,* 341 U. S., at 163 (Frankfurter, J., concurring). In the public school setting there is a high degree of such protection since a teacher has responsibility for, and a commitment to, his pupils that is absent in other due process contexts.

parison of what the Court mandates as required by due process with the protective procedures it finds constitutionally insufficient.

The Ohio statute, limiting suspensions to not more than eight school days, requires *written* notice including the "reasons therefor" to the student's parents and to the Board of Education within 24 hours of any suspension. The Court only requires oral *or* written notice to the pupil, with no notice being required to the parents or the Board of Education. The mere fact of the statutory requirement is a deterrent against arbitrary action by the principal. The Board, usually elected by the people and sensitive to constituent relations, may be expected to identify a principal whose record of suspensions merits inquiry. In any event, parents placed on written notice may exercise their rights as constituents by going directly to the Board or a member thereof if dissatisfied with the principal's decision.

Nor does the Court's due process "hearing" appear to provide significantly more protection than that already available. The Court holds only that the principal must listen to the student's "version of the events," either before suspension or thereafter—depending upon the circumstances. *Ante*, at 583. Such a truncated "hearing" is likely to be considerably less meaningful than the opportunities for correcting mistakes already available to students and parents. Indeed, in this case all of the students and parents were offered an opportunity to attend a conference with school officials.

In its rush to mandate a constitutional rule, the Court appears to give no weight to the practical manner in which suspension problems normally would be worked out under Ohio law.[15] One must doubt, then, whether

---

[15] The Court itself recognizes that the requirements it imposes are, "if anything, less than a fair-minded school principal would impose upon himself in order to avoid unfair suspensions." *Ante*, at 583.

the constitutionalization of the student-teacher relationship, with all of its attendant doctrinal and practical difficulties, will assure in any meaningful sense greater protection than that already afforded under Ohio law.

## III

No one can foresee the ultimate frontiers of the new "thicket" the Court now enters. Today's ruling appears to sweep within the protected interest in education a multitude of discretionary decisions in the educational process. Teachers and other school authorities are required to make many decisions that may have serious consequences for the pupil. They must decide, for example, how to grade the student's work, whether a student passes or fails a course,[16] whether he is to be promoted, whether he is required to take certain subjects, whether he may be excluded from interscholastic athletics[17] or other extracurricular activities, whether he may be removed from one school and sent to another, whether he may be bused long distances when available schools are nearby, and whether he should be placed in a "general," "vocational," or "college-preparatory" track.

In these and many similar situations claims of impairment of one's educational entitlement identical in principle to those before the Court today can be asserted with equal or greater justification. Likewise, in many of these situations, the pupil can advance the same types of speculative and subjective injury given critical weight in this case. The District Court, relying upon generalized opinion evidence, concluded that a suspended student may suffer psychological injury in one or more of

---

[16] See *Connelly v. University of Vermont*, 244 F. Supp. 156 (Vt. 1956).

[17] See *Kelley v. Metropolitan County Board of Education of Nashville*, 293 F. Supp. 485 (MD Tenn. 1968).

the ways set forth in the margin below.[18]　　The Court appears to adopt this rationale.　See *ante,* at 575.

It hardly need be said that if a student, as a result of a day's suspension, suffers "a blow" to his "self esteem," "feels powerless," views "teachers with resentment," or feels "stigmatized by his teachers," identical psychological harms will flow from many other routine and necessary school decisions.　The student who is given a failing grade, who is not promoted, who is excluded from certain extracurricular activities, who is assigned to a school reserved for children of less than average ability, or who is placed in the "vocational" rather than the "college preparatory" track, is unlikely to suffer any less psychological injury than if he were suspended for a day for a relatively minor infraction.[19]

---

[18] The psychological injuries so perceived were as follows:

"1. The suspension is a blow to the student's self-esteem.

"2. The student feels powerless and helpless.

"3. The student views school authorities and teachers with resentment, suspicion and fear.

"4. The student learns withdrawal as a mode of problem solving.

"5. The student has little perception of the reasons for the suspension.　He does not know what offending acts he committed.

"6. The student is stigmatized by his teachers and school administrators as a deviant.　They expect the student to be a troublemaker in the future." 372 F. Supp., at 1292.

[19] There is, no doubt, a school of modern psychological or psychiatric persuasion that maintains that *any* discipline of the young is detrimental.　Whatever one may think of the wisdom of this unproved theory, it hardly affords dependable support for a *constitutional* decision.　Moreover, even the theory's proponents would concede that the magnitude of injury depends primarily upon the individual child or teenager.　A classroom reprimand by the teacher may be more traumatic to the shy, timid introvert than expulsion would be to the aggressive, rebellious extrovert.　In my view we tend to lose our sense of perspective and proportion in a case of this kind.　For average, normal children—the vast majority— suspension for a few days is simply *not* a detriment; it is a com-

If, as seems apparent, the Court will now require due process procedures whenever such routine school decisions are challenged, the impact upon public education will be serious indeed. The discretion and judgment of federal courts across the land often will be substituted for that of the 50 state legislatures, the 14,000 school boards,[20] and the 2,000,000 [21] teachers who heretofore have been responsible for the administration of the American public school system. If the Court perceives a rational and analytically sound distinction between the discretionary decision by school authorities to suspend a pupil for a brief period, and the types of discretionary school decisions described above, it would be prudent to articulate it in today's opinion. Otherwise, the federal courts should prepare themselves for a vast new role in society.

## IV

Not so long ago, state deprivations of the most significant forms of state largesse were not thought to require due process protection on the ground that the deprivation resulted only in the loss of a state-provided "benefit." *E. g., Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46 (1950), aff'd by an equally divided Court, 341 U. S. 918 (1951). In recent years the Court, wisely in my view, has rejected the "wooden distinction between 'rights' and 'privileges,' " *Board of Regents* v. *Roth,* 408 U. S., at 571, and looked instead to the significance of the state-created or state-enforced right and to

monplace occurrence, with some 10% of all students being suspended; it leaves no scars; affects no reputations; indeed, it often may be viewed by the young as a badge of some distinction and a welcome holiday.

[20] This estimate was supplied by the National School Board Association, Washington, D. C.

[21] See U. S. Office of Education, Elementary and Secondary Public School Statistics, 1972–1973.

the substantiality of the alleged deprivation. Today's opinion appears to abandon this reasonable approach by holding in effect that government infringement of any interest to which a person is entitled, no matter what the interest or how inconsequential the infringement, requires *constitutional* protection. As it is difficult to think of any less consequential infringement than suspension of a junior high school student for a single day, it is equally difficult to perceive any principled limit to the new reach of procedural due process.[22]

---

[22] Some half dozen years ago, the Court extended First Amendment rights under limited circumstances to public school pupils. Mr. Justice Black, dissenting, viewed the decision as ushering in "an entirely new era in which the power to control pupils by the elected 'officials of state supported public schools' . . . is in ultimate effect transferred to the Supreme Court." *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 515 (1969). There were some who thought Mr. Justice Black was unduly concerned. But his prophecy is now being fulfilled. In the few years since *Tinker* there have been literally hundreds of cases by schoolchildren alleging violation of their constitutional rights. This flood of litigation, between pupils and school authorities, was triggered by a narrowly written First Amendment opinion which I could well have joined on its facts. One can only speculate as to the extent to which public education will be disrupted by giving every schoolchild the power to contest *in court* any decision made by his teacher which arguably infringes the state-conferred right to education.