415 F.Supp. 312 (1976)
José R. NAVATO, M.D., Plaintiff,
v.
Ivan W. SLETTEN, M.D., et al., Defendants.
No. 75-570C(4).
United States District Court, E. D. Missouri, E. D.
June 21, 1976.
*313 Samuel C. Ebling and John B. Lewis, Millar, Schaefer & Ebling, St. Louis, Mo., for plaintiff.
Jackson A. Wright, Marvin E. Wright, James S. Newberry, Richard S. Paden, Wright, Wright, Newberry & Paden, Columbia, *314 Mo., for defendant Curators of U. of Mo. & Ivan W. Sletten & Alice Dean Kitchen.
John C. Danforth, Atty. Gen., Glen A. Glass, Asst. Atty. Gen., Jefferson City, Mo., for defendants, Mowrer, Robb & Dept. of Mental Health.

MEMORANDUM
NANGLE, District Judge.
Plaintiff José R. Navato brought this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202, alleging denial of due process, and discrimination on the basis of national origin.
This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1. Plaintiff José R. Navato, M. D., is an oriental male resident of the state of Missouri, and was during all times relevant herein a naturalized citizen of the United States.
2. Defendant Ivan W. Sletten, M. D., is presently the Institute Director of the Missouri Institute of Psychiatry and has held this position since September, 1973. Prior to this time, Dr. Sletten was a member of the Residency Training Committee.
3. Alice Dean Kitchen, M. D., was the Director of the Residency Training Program at the Missouri Institute of Psychiatry from July 1, 1972 through July 30, 1974.
4. Marie O. Mowrer, M. D., at all times relevant herein, was a Clinical Director of Psychiatry at the St. Louis Hospital and an Assistant Professor in Psychiatry with the Missouri Institute of Psychiatry.
5. The Curators of the University of Missouri is a constitutional body, established by Article IX, Section 9(a) of the Missouri Constitution of 1945 which vests the power of government in the Board of Curators as a public corporation.
6. Harold R. Robb, M. D., is the Director of the Department of Mental Health of the Division of Health.
7. The Department of Mental Health is authorized to provide appropriate full or part-time resident or out-patient care and treatment, examination and report, education and training of persons suffering from mental illness or mental retardation, and has administrative control of the St. Louis State Hospital, St. Louis State School Hospital, Fulton State Hospital, St. Joseph State Hospital, Nevada State Hospital and Farmington State Hospital.
8. The Residency Training Program is a joint program of the University of Missouri and the Department of Mental Health, whose purpose it is to provide three years of training, in order to prepare a doctor for certification by the American Board of Psychiatry and Neurology, and two years of service. Plaintiff entered the program on August 26, 1970 and signed a contract which read in part as follows:
I understand that the Division of Mental Health, in case that I fail to adequately perform, may terminate at their discretion my services and training as a resident upon giving me thirty days' notice in writing. I also understand that I can terminate my residency by giving to the Division 30 days' notice in writing.
I agree that if I withdraw from the program without having completed my obligation of three years of training and two years of career residency experience with the Division of Mental Health, that I agree to repay to the Division a sum of $150.00 for each month of training for which I have not returned service.
9. On July 1, 1970, plaintiff received a temporary license to practice medicine from the State of Missouri and on January 8, 1972, received a permanent license.
10. Plaintiff satisfactorily completed two years of training. In his third year of training, however, questions were raised about plaintiff's competence and concern for patients.
11. Plaintiff was assigned to Dr. Mowrer's service in March of 1973 and remained *315 under Dr. Mowrer's supervision until June of the same year. This service involved rural community mental health care. Two clinics, the Sullivan Clinic and the Washington Clinic, were involved in the service. The Sullivan Clinic was conducted on Tuesdays and Thursdays. Both plaintiff and Dr. Mowrer were at the clinic on Thursdays, although plaintiff was there only a half day. Plaintiff was at the Sullivan Clinic on Tuesdays and at the Washington Clinic on Mondays.
12. On May 17, 1973, Dr. Mowrer spoke to Dr. Kitchen by telephone and related, in a brief conversation, that she had concerns about plaintiff's ability. On May 18, 1973, plaintiff met with Drs. Kitchen and Mowrer at which meeting Dr. Mowrer explained her concerns. As a result of this conference, Dr. Kitchen decided that a meeting of the Residency Committee was warranted and scheduled such a meeting for May 25, 1973. The notice of the meeting did not identify the areas to be discussed but instead stated that
You are asked to attend a special meeting of the Residency Training Committee at 9:30 a.m. on Friday, May 25, at the 6 Center Conference Room to consider possible disciplinary action against Dr. Navato.
13. At the May 25th meeting, Dr. Mowrer again expressed her concerns about plaintiff's performance. The items discussed were identical to those Dr. Mowrer had raised at the May 18th meeting with Drs. Kitchen and Navato. Specifically, Dr. Mowrer noted that plaintiff never contacted her on his own to discuss clinic operation or patients; that plaintiff had scheduled his patients at close intervals or all at once; that plaintiff had in one instance issued a prescription for a patient he had never seen but whose sister had contacted him by telephone; that plaintiff showed a lack of judgment in scheduling a particular patient for an appointment at a month's interval when the woman was apparently sufficiently ill to require more frequent visits; that plaintiff's charts were incomplete; that plaintiff once asked a secretary to gather information for him on a new patient; that during an illness of plaintiff's wife, plaintiff made no effort to inform Dr. Mowrer that he would not be present at the Clinics nor did he attempt to reschedule patients; that plaintiff rarely attended Friday staff meetings and that plaintiff, in direct contravention of his contract, was engaged in an outside practice.
14. Plaintiff was allowed to respond to the statements made. Plaintiff was present throughout Dr. Mowrer's presentation, and had notice of the items to be discussed since he had previously heard the allegations at the May 18th conference with Drs. Mowrer and Kitchen. Plaintiff was not told that he could be represented by counsel, nor did he have counsel present. No stenographic record was kept of the meeting, although minutes were taken and a tape recording was made.
15. Plaintiff explained that he scheduled a few patients at the same time in case of cancellations; that he asked the secretary to gather routine information only; that he prescribed the medicine by telephone on the basis of the records at the Clinic; that he saw only a few private patients at one clinic and none at another clinic. In his defense, plaintiff stated that the other residents in the Program were moonlighting and that he felt, as a matter of principle, that he could also. Dr. Navato also mentioned, in response to a question about his absences during his wife's illness, that he did not know about the sick leave procedure which involved filling out a slip for the Residency Program office.
16. After Dr. Mowrer and plaintiff had spoken, both left the meeting. The Committee decided that the missing Committee Members would be supplied with copies of the meeting's minutes and that the tape recording would be made available to them before a decision was reached.
17. Members of the Committee commented that plaintiff had submitted sick leave slips while on other services. Another doctor indicated that he had been given office hours, when he telephoned, at the one private clinic where plaintiff insisted he saw no patients. It is clear from the recording *316 of the proceedings that these issues were raised only to comment on plaintiff's credibility. The Committee Members concluded that plaintiff's veracity was questionable.
18. The members separated the moonlighting issue from the issue of lack of patient concern, but felt that the moonlighting was perhaps the cause of his lack of concern and apparent haste in dealing with the patients at the clinics. The Committee decided that the question concerning adequacy of patient records was better handled by the clinical instructor than by Committee action.
19. On June 4, 1973, the Residency Training Committee met and again considered the issues raised. Recommendations from the Committee Members had been previously requested. The decision, dated June 8, 1973, stated the following:
This memo will convey to you officially in writing the decision of the Training Committee on June 4, 1973 with regard to the question of disciplinary action raised by Dr. Mowrer at the previous meeting at which you were present. As I stated when we talked the evening of June 4, the Committee did not feel that there was adequate evidence to reprimand or discipline you for some of the issues that Dr. Mowrer had raised. However the disciplinary action written below was decided on your participation and performance in the Residency Training per se, as you will see from the attached copy of the third page of the Minutes of June 4. Because of persistent borderline to clearly deficient participation in the training opportunity provided during the last year and a half, there was full consensus of the committee that the following disciplinary action was justified.
1. That you would be required to repeat six months of training satisfactorily before we would issue a certificate giving you credit for three years of training. During the repeat six months of training you would be on probation with the clear understanding that inadequate performance and participation in the Training Program during that period of time would result in a further six month probationary period. It was suggested that the six months of repeated training be 3 months with Dr. Mowrer in Community Clinics and 3 months in the Youth Center.
2. You are not to engage in private practice or any form of moonlighting. Knowledge of such activity would immediately result in a demand for your resignation.
3. Your salary will be maintained at a 3rd year level during the probationary period.
20. On June 11, 1973, plaintiff wrote to Dr. Kitchen requesting a reconsideration of this determination. On the same date, by a separate letter, plaintiff tendered his resignation from the Program.
21. On July 9, 1973, Dr. Kitchen wrote plaintiff indicating that the decision would not be changed. Dr. Kitchen also stated that
. . . we would certify you only for two full years of training with accreditable performance. In writing a letter for you, we would be willing to state that you worked here for three years, and the third year could count as experience toward American Boards, but we can credit you with only two years of training in this program.
22. By a separate letter the same date, Dr. Kitchen reminded plaintiff of the payback provisions in his contract and requested that plaintiff pay the Residency Training Program the $3,000.00 differential which was owing upon plaintiff's resignation.
23. Plaintiff's evaluations from prior clinic rotations were generally good. A number, however, indicated deficiencies in the area denominated "RESPONSIBILITY".
24. Credible evidence established that whenever the Committee became aware of moonlighting by residents, the residents were told that they had to refrain from moonlighting or resign from the program.
*317 25. Statistics were presented which indicate that of the 16 persons entering the Residency Training Program in 1970, only 2 were from the United States; 11 were white; and 3 non-whites resigned before completing the program. Of the 17 persons entering the Program in 1971, 8 were from the United States; 13 were white; and 2 non-whites resigned. Of the 11 entering in 1973, 1 was from the United States; 7 were white; and 2 of the 3 persons who resigned were non-whites. In addition, there were 2 persons classified as "miscellaneous", both of whom were Asians and both of whom resigned the Program within a year. Thus, in this three-year period, there were 60 persons in the program. Of the 12 resignations in this group, 9 were non-whites and none of those resigning were from the United States. There was credible evidence, however, that the doctors whose origins were from countries other than the United States had language and cultural adaption difficulties, problems made more severe by the fact that these doctors were involved in psychiatry.
26. The evidence totally fails to establish that the actions taken by the Residency Committee were due, in whole or in part, to discrimination on account of plaintiff's race or national origin.

CONCLUSIONS OF LAW
This Court has jurisdiction over the subject matter and the parties to the suit. 28 U.S.C. § 1343.
The Court has found that the actions taken by the Residency Committee were not the result, either in whole or in part, of discrimination on account of plaintiff's race or national origin. The statistical evidence produced fails to establish such discrimination. See Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975) wherein the court stated that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded". Furthermore, the statistics produce evidence of resignations, not "disciplinary actions" and the Court fails to perceive how evidence of resignations can establish plaintiff's allegation of disparate disciplinary actions.
Plaintiff contends that he was denied due process in these disciplinary proceedings. He makes much of the fact that the proceedings were denominated "disciplinary" and the decision reached was couched in terms of discipline. Nonetheless, the Court concludes that, with the exception of the issue relating to moonlighting, the proceedings were not disciplinary in nature, but instead were an academic review of plaintiff's performance. Under these circumstances, plaintiff was not denied due process.
The courts have distinguished between academic evaluations and disciplinary actions with great deference accorded to the results of academic evaluations. Greenhill v. Bailey, 519 F.2d 5 (8th Cir. 1975); Gaspar v. Bruton, 513 F.2d 843 (10th Cir. 1975); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Keys v. Sawyer, 353 F.Supp. 936 (S.D.Texas 1973); Connelly v. University of Vermont and State Agricultural College, 244 F.Supp. 156 (D.C.Vt.1965).
The general rule is that
Courts have historically refrained from interfering with the authority vested in school officials to drop a student from the rolls for failure to attain or maintain prescribed scholastic ratings (whether judged by objective and/or subjective standards), absent a clear showing that the officials have acted arbitrarily or have abused the discretionary authority vested in them. Gaspar v. Bruton, supra, 513 F.2d at 850.
Clearly, the Committee was concerned with allegations that plaintiff showed a lack of concern for his patients and that his performance was below that required. Such concerns can not possibly be considered disciplinary ones. Plaintiff was not confronted with allegations that he violated rules of conduct, or engaged in disruptive behavior. Instead, the Committee was concerned with his academic performance *318 in the clinical setting. Evaluations of clinical performance are as much a part of academic review as traditional examinations. The courts are not qualified to pass judgment on the issues presented in the review, e. g., whether plaintiff's handling of patients was appropriate; whether medication should be prescribed by telephone; whether a particular patient should have returned in a month or two weeks. Clearly, these are matters of professional judgment and it is precisely this judgment which plaintiff was supposed to obtain during his clinical assignments. In reviewing his performance, the Committee was engaged in an academic evaluation and a denomination of the proceedings as disciplinary can not change their character.
The sole exception to the rule that the courts will defer to the decisions of school officials, absent a showing of arbitrary conduct or abuse of discretion, is when the individual is deprived "of a significant interest in either liberty or property". Greenhill v. Bailey, supra, 519 F.2d at 7. In Greenhill, which involved the academic dismissal of a medical student, the court found such a deprivation in the fact that the school had notified a committee of the Association of American Medical Colleges about the plaintiff's lack of intellectual ability. The court concluded that this notification constituted a deprivation as "it admittedly `imposed on him a stigma or other disability that foreclose[s] his freedom to take advantage of other * * * opportunities'". Id. at 8. Under those circumstances, the court concluded that due process safeguards were applicable. The present case, however, does not involve such a deprivation. Plaintiff was not even deprived of the opportunity to finish the Program. He was not suspended or expelled but merely placed on a probationary status and required to repeat six months of training. It was plaintiff's decision to withdraw from the Program and thus force himself to either forego certification entirely or seek entry into another program. Dr. Kitchen told plaintiff that they would state that he had completed two years of training and one year of service. There was no evidence indicating that such a statement would prevent plaintiff from entering another program. The type of action taken, imposition of probation, does not impose the type of stigma as envisioned by the court in Greenhill such that due process safeguards were required. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The evidence supports the Committee's decision to require a repeat of certain training, and there is no evidence from which to conclude that defendants acted arbitrarily or abused their discretion.
The only action which would be considered disciplinary was the warning that plaintiff was to stop engaging in private practice and that a failure to so stop would result in a request for a resignation. The Court hesitates to conclude that the rigors of due process are required whenever a warning of misconduct is imposed. Nonetheless, plaintiff had notice that this issue was to be discussed, albeit not in writing; he had the opportunity to present his version of the facts; and was afforded a hearing before the Residency Committee. Under these circumstances, and in light of the disciplinary action taken, the Court concludes that due process was afforded. See Klinge v. Lutheran Charities Association of St. Louis, 523 F.2d 56 (8th Cir. 1975); Woodbury v. McKinnon, 447 F.2d 839 (5th Cir. 1971) (holding that cross examination is not required); Greenhill v. Bailey, 519 F.2d 5 (8th Cir. 1975) (indicating that cross-examination and presence of counsel is not required). As is frequently noted, "due process is protean in nature. The determination of what process is due depends on appropriate accommodation of the competing interests involved". Chung v. Park, 514 F.2d 382 (3rd Cir. 1975), cert. denied, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). The Court can not conclude that plaintiff's interest in not receiving a warning about conduct which clearly violated the provisions of his contract was such that written charges, a hearing, presence of counsel, the right of cross-examination, and the transcription of the hearing were required. *319 Such requirements clearly exceed the safeguards needed to establish that the action is not unreasonable, arbitrary or capricious. Plaintiff was aware that moonlighting was forbidden, and the warning given was the same as that given to all other residents caught moonlighting.
Defendant Department of Mental Health has counterclaimed for the $3,000.00 owing under the contract following plaintiff's resignation. Plaintiff contends that he is willing to pay this sum
if Defendant likewise honors the contract and issues him said Certificate of Training. Any other relief for the Defendant would be inequitable since it refused and continues to refuse to issue a Certificate of Training to Plaintiff as it is required under the contractual provisions.
This position is erroneous. The contract does not require that defendants issue a Certificate of Training simply because plaintiff has been a resident in the Program for three years. While the Contract Letter does state that the Program will provide three years of training which prepares the resident for certification by the American Board of Psychiatry and Neurology, the contract itself provides that training may be terminated for inadequate performance. Clearly this Court can not require defendants to certify that a resident has adequately completed three years of training when defendants, who have not acted arbitrarily or in abuse of their discretion, have determined that plaintiff did not perform adequately. Furthermore, even if the Court had found arbitrariness or an abuse of discretion, such a remedy would not be appropriate. Wellner v. Minnesota State Junior College Board, 487 F.2d 153 (8th Cir. 1973).
Plaintiff has signed a contract which requires him to repay defendants a sum certain for withdrawing from the program without completing his training and service. Rather than complete his training, plaintiff decided to withdraw and accordingly, the Court concludes that plaintiff is obligated to repay the sum of $3,000.00 as required by the contract.
Accordingly, judgment will be entered for defendants on plaintiff's claim and for defendant Department of Mental Health on its counterclaim.