KELLY, Circuit Judge,
concurring in part and dissenting in part.
This case highlights the evolving nature of students’ First Amendment protection for speech on social media. While I disagree with the court’s determination that Keefe was afforded procedural due process, I would affirm the district court on that issue because defendants are entitled to qualified immunity. However, because I think there is a genuine issue of material fact as to whether the school could constitutionally regulate Keefe’s off-campus, non-academic speech, I would reverse the district court’s grant of summary judgment in favor of defendants on Keefe’s First Amendment claim.
I. Due Process Claim
A. Academic v. Disciplinary Dismissals
The court declines to characterize Keefe’s dismissal as either academic or disciplinary, explaining that the distinction is procedurally irrelevant because Keefe received due process under either standard. I disagree. The Supreme Court has explained that “[tjhere is a clear dichotomy between a student’s due process rights in disciplinary dismissals and in academic dismissals.” Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 87 n.4, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (quoting Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir. 1976)). The Due Process Clause imposes “less stringent procedural requirements in the case of an academic dismissal,” id. at 86, 98 S.Ct. 948, recognizing that judges are ill-equipped to second-guess the academic judgment of school administrators.
But this hands-off approach is appropriate only when the school’s decision is, in fact, academic. If, as the administrators contend, the reason for the dismissal was “the violation by a student of valid rules of conduct”—here, the College’s Code of Conduct—the Supreme Court has said the dismissal is properly characterized as disciplinary, not academic. Id. at 86-90, 98 S.Ct. 948 (characterizing sanctions for “disruptive or insubordinate behavior” as disciplinary); see also Monroe v. Ark. State Univ., 495 F.3d 591, 595 (8th Cir. 2007) (recognizing that a dismissal for “alleged, but not conceded drug "use, might constitute a disciplinary dismissal”); Pugel v. Bd. of Trs. of Univ. of Ill., 378 F.3d 659, 663-64 & n.4 (7th Cir. 2004) (collecting cases analyzing dismissals for academic dishonesty as disciplinary and assuming the same); Henson v. Honor Comm. of U. Va., 719 F.2d 69, 73-74 (4th Cir. 1983) (analyzing investigation of law student for alleged Honor Code violations as disciplinary). Both Frisch and the College’s Dean of Students, Beth Adams, characterized a pri- or incident involving a verbal threat by another student against an instructor as nonacademic. See Horowitz, 435 U.S. at 90, 98 S.Ct. 948.
The cases where we have characterized a dismissal as academic illustrate why Keefe’s dismissal was not. The students in those cases were dismissed based at least in part on issues related to the school’s curriculum, like failing to complete coursework, Monroe, 495 F.3d at 592-93; failing exams, lack of preparation, and absenteeism, Richmond v. Fowlkes, 228 F.3d 854, 858 (8th Cir. 2000); or cheating on an exam and then lying about it, Corso v. Creighton Univ., 731 F.2d 529, 532 (8th Cir. 1984). *538 These cases are consistent with Horowitz, which described an academic dismissal as one based on “failure to attain a standard of scholarship.” Horowitz, 435 U.S. at 87 n.4, 98 S.Ct. 948 (quoting Mahavongsanan, 529 F.2d at 449-50). Keefe was dismissed as a result of a conflict with classmates on Facebook. Case law does not support classifying as “academic” dismissals based on off-campus speech that merely happened to be about the school or its students.
Furthermore, administrators treated Keefe’s dismissal like a disciplinary one: They dismissed him. immediately after learning of his Facebook posts, with no attempt to work with him to improve his conduct. Academic dismissals receive less stringent procedural protections in .part because they involve an educational process that is “not by nature adversary.” Horowitz, 435 U.S. at 90, 98 S.Ct. 948. In Horowitz, the decision to expel a medical student “rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal,” based on the fact that faculty had for two years expressed dissatisfaction with her clinical performance. Id. at 89-90, 98 S.Ct. 948. In contrast, Frisch reported that she was unaware of any prior professionalism problems involving Keefe. There is nothing in the record to suggest he had been told to improve his relations with his classmates or was reprimanded for previous behavior that his instructors thought unbecoming of a nurse. Rather than a cooperative, non-adversarial effort to improve Keefe’s professionalism that proved unsuccessful over time, the dismissal was an immediate imposition of discipline for misbehavior.
The College’s Code of Conduct sets forth such ostensibly academic goals as “Human Flourishing, Nursing Judgment, Professional Identity, and Spirit of Inquiry.” It goes on to state that the College aims to instill in its graduates qualities like “evidence-based practice, life-long learning, service learning/civic engagement, caring, advocacy, excellence, and safe quality care for diverse patients within a family and community context.” The Code of Conduct also requires students to uphold the American Nurses Association Code of Ethics, which sets forth similar requirements. These goals are admirable, and describe commendable traits for a person entering the nursing profession. Yet with such general requirements of character, excellence, and virtue, it is difficult to imagine any type of misconduct that would not, in some way, violate one or more of these requirements. The court’s holding allows the school to treat any action it deems viola-tive of the Code of Conduct as an academic problem rather than a disciplinary problem. This interpretation collapses the distinction between academic and disciplinary dismissals, and I am not inclined to signal the end of the latter as a meaningful category.[7]
*539 No doubt Keefe’s attitudes toward his classmates left something to be desired. And no doubt- all educational institutions, perhaps professional degree programs in particular, want to make sure that their future alumni treat their colleagues, clients, and' the general public with respect. But a public college cannot transform a punishment for “disruptive or insubordinate behavior,” Horowitz, 435 U.S. at 90, 98 S.Ct. 948, into an academic decision simply by declaring it an academic goal of the school to cultivate civility in its students. I would categorize Keefe’s dismissal disciplinary, rather than academic, and therefore turn to the question of whether Keefe received sufficient process throughout his disciplinary expulsion proceedings.
B. Process Required for Disciplinary Dismissal
In Goss v. Lopez, the Supreme Court held that even a short disciplinary suspension requires that the student “be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.” 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Looking at the facts in the light most favorable to Keefe—as we must on an appeal from a grant of summary judgment against him— I think the notice he received was inadequate.
Timely and clear notice is a fundamental guarantee of the Due Process Clause, which “requires that some kind of prior notice be given.” Navato v. Sletten, 560 F.2d 340, 345 (8th Cir. 1977). Even in the context of academic dismissals, which have less stringent procedural requirements than disciplinary dismissals, a student must have “prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal.” Schuler v. Univ. of Minn., 788 F.2d 510, 514 (8th Cir. 1986). Consistent with this principle, the College’s Code of Conduct states that even for informal hearings, “[pjrior to th[ej meeting, the student shall be given written notice of the specific complaint against him/her and the nature of the evidence available to support the complaint and provided with a copy of the code of conduct.” (emphasis added.) Formal hearings carry with them even more extensive requirements.
Keefe did not receive sufficient prior notice. He was not told the purpose of his meeting with Frisch prior to the time of meeting, much less the evidence against him. The decision to dismiss him was made at the meeting itself—if not before—without giving him time to review the posts and formulate a considered defense. Frisch did not allow Keefe to read copies of the offending Facebook posts at the meeting. And McCalla conceded that he provided Keefe with printed copies of the Facebook posts only after Keefe had appealed his dismissal. Since those present at the initial disciplinary meeting disagree as to which posts were discussed there,[8] it is possible that Keefe went through the entire disciplinary process without knowing exactly which Facebook posts led to his dismissal. Finally, the undisputed facts do not establish that anyone told Keefe which specific rule or Code provision he allegedly violated.
It is true that' in Goss the Supreme Court stated that “[t]here need be no delay between the time ‘notice’ is given and *540 the time of the hearing.” 419 U.S. at 582, 95 S.Ct. 729. But, it also cautioned that it was addressing itself “solely to the short suspension, not exceeding 10 days” and that “the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.” Id. at 579, 584, 95 S.Ct. 729. It went on to elaborate that “[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.” Id. at 584, 95 S.Ct. 729. Here, Keefe faced expulsion from. the nursing program, and he was entitled to adequate notice before the hearing[9] unless the school can provide good reasons why that would have been inadvisable.[10] See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that “the fiscal and administrative burdens that the additional or substitute procedural requirement would entail” must be considered in determining what due process requires).
These flaws in the disciplinary process were not rendered harmless by Keefe’s admission on appeal that he wrote at least some of the Facebook posts in question and concession that they were unprofessional. Keefe asserts he only knew about the administration’s concerns with two of his posts at the time he appealed; he may well have declined to make similar concessions with respect to any other posts on which Frisch based her decision. Also, the fact that Keefe admitted wrongdoing on appeal does not necessarily mean he would have done the same at the initial meeting, had he been given adequate notice and time to deliberate. With sufficient opportunity to prepare, he might have presented evidence in support of another defense: for example, that it was clear from the context that his Facebook posts were meant to be humorous, that other students had made similar posts without being disciplined, or that the printouts used by Frisch and McCalla did not accurately reflect what he had written. But more fundamentally, the idea that the problems with the constitutionally inadequate process Keefe’received are excusable simply because it happened to arrive at the correct result mistakes the right that the Due Process Clause pro *541 tects. “[T]he right to procedural due process is ‘absolute’ in the sense that it does not depend upon the merits of a claimant’s substantive assertions.... ” Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). It is the fairness of the process that was deficient here, even if the substantive outcome of the process was correct.
C. Qualified Immunity
Nevertheless, I would hold that the administrators are entitled to qualified immunity on Keefe’s due process claim, and are thus shielded from Keefe’s claim to money damages, though not his request for an injunction. See Burnham v. Ianni, 119 F.3d 668, 673 n.7 (8th Cir. 1997) (en banc). A government official “is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation.” Robinson v. Payton, 791 F.3d 824, 828 (8th Cir. 2015). In order to be “clearly established,” a right’s contours must have been “sufficiently definite that any reasonable official in the defendant’s shoes would have understood that he was violating it.” Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014). While there need not be a prior case finding a constitutional or statutory violation on identical facts in order for the right to be clearly established, Williams v. Jackson, 600 F.3d 1007, 1013 (8th Cir. 2010), the Supreme Court has enjoined us not to “define clearly established law at a high level of generality,” but rather to ask whether “existing precedent ... placed the statutory or constitutional question beyond debate,” Ashcroft v. al-Kidd, 563 U.S. 731, 741-42, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).
What precludes a finding that the administrators violated clearly established due process rights is the dearth of prior decisions classifying expulsions of professional students as academic or disciplinary, and the lack of uniformity in the decisions that do exist. As the preceding discussion and the cases cited therein suggest, student dismissals are not self-categorizing, and there was no controlling authority in this jurisdiction or a “consensus of cases of persuasive authority” in others on which the administrators could have relied to determine whether they should be held to the standards of disciplinary, as opposed to academic, dismissals. Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). “Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.” Scott v. Baldwin, 720 F.3d 1034, 1036 (8th Cir. 2013) (quoting Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).
Accordingly, I would hold that the administrators are not entitled to summary judgment on the merits of Keefe’s due process claim, but that they are entitled to summary judgment on their qualified immunity defense.
II. First Amendment Claim
Colleges and universities are free to encourage professionalism by adopting codes of conduct that impose restrictions on student speech, provided those restrictions do not run afoul of the First Amendment. “[T]he precedents of [the Supreme] Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.” Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); see also Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828-30, 115 S.Ct. 2510, 132 L.Ed.2d 700 *542 (1995); Widmar v. Vincent, 454 U.S. 263, 269-70, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Papish v. Bd. of Curators of Univ. of Mo., 410 U.S. 667, 669-70, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (per curiam).
Restrictions on student speech do not violate the First Amendment when educators exercise “editorial control over the style and content of student speech” that is “school-sponsored,” provided “their actions are reasonably related to legitimate pedagogical concerns.” Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Here, Keefe’s speech was off-campus, was not school-sponsored, and cannot be reasonably attributed to the school.[11] Hazelwood’s “reasonably related to legitimate pedagogical concerns” test is therefore inapplicable in this case. See Morse v. Frederick, 551 U.S. 393, 405, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (holding that Hazelwood “does not control this case because no one would reasonably believe that [a student’s] banner bore the school’s imprimatur”); Keeton v. Anderson-Wiley, 664 F.3d 865, 882 (11th Cir. 2011) (Pryor, J., concurring) (“Hazel-wood does not allow retaliation against disfavored speech that occurs outside the classroom.”); Morgan v. Swanson, 659 F.3d 359, 408-09 (5th Cir. 2011) (en banc) (“Like all exceptions to the First Amendment’s protections, the Hazelwood exception should be construed narrowly.’’); Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 213-14 (3d Cir. 2001) (Alito, J.) (“Hazel-wood’s permissive ‘legitimate pedagogical concern’ test governs only when a student’s school-sponsored speech could reasonably be viewed as speech of the school itself[.]”).
However, even when speech, is not school-sponsored or reasonably attributable to the school, institutions may regulate some student speech that occurs in class or on campus without violating the First Amendment. See Morse, 551 U.S. at 405, 127 S.Ct. 2618 (distinguishing Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)) (“Had Fraser delivered the same [offensively lewd and indecent] speech in a public forum outside the school context, he would have been protected.”); Oyama, 813 F.3d at 872 (permitting denial of student’s application “based ... only upon statements [the student] made in the context of the certification program—in the classroom, in written assignments, and directly to the instructors responsible for evaluating his suitability for teaching”).[12]
The court relies heavily on the school’s ability to impose a code of ethics as an “academic” requirement, and explains that, “because compliance with the Nurses Association Code of Ethics is a legitimate part of the Associate Nursing Program’s curriculum, speech reflecting non-compliance with that Code that is related to academic activities ‘materially disrupts’ the Program’s ‘legitimate pedagogical con *543 cerns.’ ” Supra at 531 (citing Keeton, 664 F.3d at 876, for reliance on Hazelwood’s framework).[13] However, we are not faced with a situation where the school is punishing a student’s failure to abide by rules of conduct akin to a professor’s marking down a student for what he says as part of an academic assignment. Cf. Healy, 408 U.S. at 191-94, 92 S.Ct. 2338 (permitting college to withhold recognition from groups unwilling “to be bound by reasonable school rules governing conduct”); C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 211 (3d Cir. 2000) (Alito, J., dissenting) (explaining .that because a classroom can be thought of as a government-owned forum, “if a student is asked to solve a problem in mathematics or to write an essay on a great American poet, the student clearly does not have a right to speak or write about the Bible instead”). Keefe’s Facebook posts were not made as part of fulfilling a program requirement and did not express an intention to break specific curricular rules. See Keeton, 664 F.3d at 868-71, 873-75 (permitting university to require student to complete remediation plan before participating in clinical practicum because she told classmates and professors she planned to violate practicum rules); Axson-Flynn v. Johnson, 356 F.3d 1277, 1289 (10th Cir. 2004) (finding Hazel-wood’s framework “applicable in a university setting for speech that occurs in a classroom as part of a class curriculum.” (emphasis added)); Brown v. Li, 308 F.3d 939, 947-52 (9th Cir. 2002) (opinion of Gra-ber, J.) (concluding in an opinion not joined by other panel members that Hazel-wood permits,an educator to “require that a student comply with the terms of an academic assignment” while acknowledging that courts “have held that Hazel-wood deference does not apply” to extracurricular activities). Furthermore, Oyama affirmatively rejects the 'notion that students can be disciplined based on speech unrelated to the fulfillment of a curricular requirement. See Oyama, 813 F.3d at 872 (emphasizing the fact that'“[t]here [was] no evidence that the University relied upon any statements Oyama may have made outside [the context of his certification program] or communicated to a broader audience” in denying his student teaching application).
The Supreme Court’s decisions in Morse and Fraser foreclose the court’s contention that Keefe’s posts are equivalent to curricular speech simply because they were directed at classmates and involved their conduct in the Nursing Program. Fraser involved a speech by a high school student nominating a fellow student for student elective office, during which he “referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor.” Fraser, 478 U.S. at 677-78, 106 S.Ct. 3159. Although this speech was clearly directed at classmates and school-related, the Supreme Court went out of its way in Morse to underscore that Fraser’s speech would have been protected if it had been delivered outside of school. Morse, 551 U.S. at 405, 127 S.Ct. 2618; see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 925-33 (3d Cir. 2011) (en banc) (holding that First Amendment barred school from punishing student for vulgar MySpace post concerning principal be *544 cause it was off-campus speech); Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 211-19 (3d Cir. 2011) (en banc) (same). Similarly, Keefe’s mere use of a word we associate with medical training does not make his post equivalent to curricular speech—such a finding would sweep far too broadly.
The College and the district court felt that Keefe’s Facebook posts constituted “behavior unbecoming of the profession and transgression of professional boundaries,” in violation of the Code of Conduct. Keefe’s statements may indeed violate the administrators’ interpretation of certain provisions of the College’s professionalism Code, but that does not answer the question of whether that interpretation is consistent with the First Amendment. See United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2544, 183 L.Ed.2d 574 (2012) (plurality opinion) (quoting United States v. Stevens, 559 U.S. 460, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010)) (The Supreme Court “has rejected as ‘startling and dangerous’ a ‘free-floating test for First Amendment coverage ... [based on] an ad hoc balancing of relative social costs and benefits.’ ”) (alteration in original). Quite simply, Code requirements that nurses treat others with “respect and compassion” and avoid “any and all forms of prejudicial actions” or “disregard for the effect of one’s actions on others” could easily be used to restrict protected speech. See, e.g., McCauley, 618 F.3d at 247-52 (concluding that provisions of university’s Code of Conduct that prohibited “conduct which causes emotional distress” and “offensive signs” were unconstitutionally overbroad); DeJohn v. Temple Univ., 537 F.3d 301, 317-20 (3d Cir. 2008) (public university’s policy that sought to forbid “gender-motivated” conduct that had the purpose of “creating an intimidating, hostile, or offensive environment” held unconstitutional); Papish, 410 U.S. at 667-70 & n.2, 93 S.Ct. 1197 (holding that university violated First Amendment by expelling student for printing indecent newspaper despite student code prohibiting “indecent conduct or speech”). In addition, when a college applies a generalized Code of Conduct to speech after the fact, I question whether students like Keefe are provided sufficient notice of what the Code prohibited and what it allowed. Cf. Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 723-24 (8th Cir. 1998).
A number of long-standing First Amendment doctrines leave public schools and universities ample room to discipline students based on what they say on campus or in academic assignments. See Morse, 551 U.S. at 422-23, 127 S.Ct. 2618 (Alito, J., concurring) (listing these doctrines).[14] The majority of the cases relied on by the court involve discipline of this sort. See Oyama, 813 F.3d at 872; Ward v. Polite, 667 F.3d 727, 733 (6th Cir. 2012); Keeton, 664 F.3d at 876. But see Tatro v. Univ. of Minn., 816 N.W.2d 509, 521 (Minn. 2012).[15] But these traditional exceptions do *545 not apply to off-campus speech unrelated to academic assignments, like Keefe’s Fa-cebook posts. See Bystrom, 822 F.2d at 750 (explaining that in comparison with regulating speech on school grounds, the burden to justify restrictions on off-campus speech “would be much greater, perhaps even insurmountable”).
Based on the record before us, I think that summary judgment was improperly granted to the administrators on Keefe’s First Amendment claim. Genuine issues of material fact remain concerning whether the administrators could permissibly restrict the speech at issue in this case in the manner that they did.

. To be sure, I do not suggest that a dismissal must be based on poor grades or other objective indicia of subpar scholarship in order to qualify as "academic.” As the Supreme Court has noted, “[p]ersonal hygiene and timeliness may be as important ... in a school's determination of whether a student will make a good medical doctor as the student’s ability to take a case history or diagnose an illness." Horowitz, 435 U.S. at 91 n.6, 98 S.Ct. 948. The concept of "professionalism” as a program requirement muddies the distinction between academic and disciplinary decisions. See, e.g., Al-Dabagh v. Case W. Reserve Univ., 777 F.3d 355, 359-60 (6th Cir. 2015); Ku v. Tenn., 322 F.3d 431, 436 (6th Cir. 2003); Hennessy v. City of Melrose, 194 F.3d 237, 250-51 (1st Cir. 1999). Therefore, the basis for a school’s dismissal must have some connection to the qualities traditionally regarded as scholastic—not simply moral—be *539 fore the laxer protections afforded to academic dismissals will apply.

. Indeed, the parties dispute whether Frisch brought up the post she later testified she was “most disturbed by” during the meeting—the post referencing a hemopneumothorax.

. The court cites Cleveland Board of Education v. Loudermill, 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), and Sutton v. Bailey, 702 F.3d 444, 448 (8th Cir. 2012), for the proposition that Goss's procedural protections may be required in the event of “an academic decision of a disciplinary nature,” but. that the extent of the pre-dismissal procedure required depends on whether additional, post-dismissal procedure is provided. However, Loudermill and Sutton do not address due process in the context of school disciplinary action, and do not abrogate the "clear dichotomy between a student's due process rights in disciplinary dismissals and in academic, dismissals,” Horowitz, 435 U.S. at 87 n.4, 98 S.Ct. 948 (quoting Mahavongsanan, 529 F.2d at 450)—a distinction that made a significant difference in the process available to Keefe. Specifically, Keefe was not afforded a formal appeal hearing precisely because the school deemed his dismissal "academic” rather than "disciplinary.” Loudermill and Sutton do not affect the "rudimentary procedures” mandated by Goss. Goss, 419 U.S. at 584, 95 S.Ct. 729. Defendants were obligated to provide Keefe with pre-removal notice and opportunity to be heard. Here, in a case involving a punishment more severe than the suspensions in Goss, they failed to provide that notice.

. The only reasons Frisch gave for not telling Keefe the purpose of the meeting beforehand were that she had never done so with other students—which, of course, simply raises the question of why not—and that she was concerned that Keefe would change his Face-book page before the meeting. Yet Frisch had already received printed copies of the posts from Scott (who got them from one of the students who complained about Keefe) and accessed the Facebook page to verify that the posts did in fact exist.

. The fact that Keefe was a college student also cautions against too lenient an interpretation of his First Amendment protections. Restrictions permissible in secondary schools may be impermissible at post-secondary institutions because ”[f]ew college students are minors, and colleges are traditionally places of virtually unlimited free expression.” Bystrom ex rel. Bystrom v. Fridley High Sch., 822 F.2d 747, 750 (8th Cir. 1987); see also Hazelwood, 484 U.S. at 273 n.7, 108 S.Ct. 562 (reserving question of whether greater deference is appropriate at the college and university level); Oyama v. Univ. of Haw., 813 F.3d 850, 871-72 (9th Cir. 2015); McCauley v. Univ. of the V.I., 618 F.3d 232, 242, 242-47 (3d Cir. 2010); Kincaid v. Gibson, 236 F.3d 342, 346 n.5, 352 (6th Cir. 2001) (en banc); Student Gov’t Ass'n v. Bd. of Trs. of Univ. of Mass., 868 F.2d 473, 480 n.6 (1st Cir. 1989).

. The Ninth Circuit’s opinion in Oyama was issued after this appeal was tiki.

. While I agree Keefe could have been disciplined for speech that qualified as a "true threat” or a "substantial disruption,” the district court made no findings with respect to whether Keefe’s Facebook posts qualified for these categorical exceptions to the First Amendment. See, e.g., Watts v. United States, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam) (true threat); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (substantial disruption of school activities or invasion of the rights of others).

. The votes of Justices Alito and Kennedy were necessary to the majority opinion and expressly conditioned on the understanding of the majority opinion laid out in Justice Alito's concurrence, so the concurrence is controlling. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (explaining that when "no single rationale explaining the result [of a case] enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds’ ”) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

. While Tatro is factually similar to this case in some ways, I question whether it is consistent with binding Supreme Court precedent. See Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 1666-67, 191 L.Ed.2d 570 (2015) ("[A] history and tradition of regu *545 lation are important factors in determining whether to recognize 'new categories of unprotected speech.'") (quoting Brown v. Entm't Merchs. Assn., 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011)); Reed v. Town of Gilbert, — U.S. -, 135 S.Ct. 2218, 2229, 192 L.Ed.2d 236 (2015) (rejecting notion that more permissive First Amendment standard was justified by state’s interest in the "regulation of professional conduct”) (quoting NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).