JAMES, J.,
dissenting:
■ ■■ ¶ 45. Mahaffey was dismissed from William Carey University’s College of Osteopathic Medicine (COM) for what was ultimately deemed “disciplinary issues” based on a “pattern of unprofessional behavior.” Bécause I find that the chancellor erred, I would reverse the grant of summary judgment and remand this case to the chancery court.
DISCUSSION
I. Whether there are genuine issues of material fact that preclude summary judgment.
¶ 46. At the outset, I find that there are genuine issues of material fact that preclude the grant of summary judgment. The supreme court’s decision in University of Mississippi Medical Center v. Hughes, 765 So.2d 528, 532 (¶ 13) (Miss.2000), which is the guiding case for university dismissals, involved no disputed facts. Here, however, several instances of misconduct used as grounds to place Mahaffey on probation and that also subsequently formed the basis of his dismissal were disputed.
¶47. In December 2011, an incident occurred at the Hattiesburg Clinic surrounding a surgery performed by Dr. William Thomas III, whom Mahaffey shadowed after expressing an interest in plastic surgery. There was a dispute about whether Mahaffey was allowed to scrub-in that surgery. A nurse alleged that Mahaf-fey scrubbed-in, broke the sterile field, and forced the surgeons to re-scrub. The surgeon, however, signed an affidavit stating that he did not have to re-scrub and was unaware of Mahaffey breaking the sterile field.
¶ 48. On August 1, 2012, Mahaffey began rotations at South Central Regional Medical Center in Laurel, Mississippi. William Carey claims that during orientation, Mahaffey improperly parked his car in the hospital parking lot after being specifically told not to do so. Mahaffey contended that he was unaware that he improperly parked his car and moved his vehicle when he was' asked to move. William Carey claimed he was using Facebook and sending text messages at orientation. Mahffey denied this allegation. Mahaffey contended that his phone did not even have internet access, so it would be impossible to log in to Facebook. Mahaffey also explained he only sent text messages during breaks and merely took notes on his phone.
¶ 49. There was also a dispute of material fact regarding whether Mahaffey was in compliance with the express conditions of his probation. It is undisputed, howev *855 er, that the Committee’s minutes reflecting a meeting on April 17, 2013, state that Mahaffey “seemed to be doing acceptably] on probation well enough that the Dean asked the Committee if he could be taken off.” The minutes also state that at the meeting of March 26, 2013, the Committee did not recommend that he be taken off probation despite the dean’s report.
¶ 50. There was also a dispute of material fact regarding whether the “zero tolerance” probation also encompassed, reasons other than those conditions enumerated in the probation letter. The chancellor found that Mahaffey understood the conditions of. his probation and the ramifications of any future violation of his probation. However, Mahaffey claimed that, based on his communications with William Carey personnel, he understood “zero tolerance” for future violations to be limited to the specific conditions of his probation according to his own interpretation of the student handbook.
¶ 51. . There is no undisputed evidence that Mahaffey violated any of the four conditions of his probation. William Carey claimed that Mahaffey used a different name to schedule an appointment with a counselor other than the one assigned to him by the school. Mahaffey explained that he used his full legal name rather than Jacob because his medical records were maintained under his full legal name. The parties dispute whether setting up additional counseling by a different counselor would constitute a breach of a condition of his probation when he also maintained his counseling sessions ^vith the counselor assigned by the COM.
¶ 52. William Carey also claimed that Mahaffey was asking too many questions constituting harassment of the staff of the Boards, Boot Camp program. However, an email from the Boards Boot Camp personnel to Mahaffey is at conflict with this allegation because it unequivocally encourages students to ask questions.
¶ 53. There was a genuine issue of material fact regarding the discrepancy in the logs for Mahaffey’s pediatrics rotation, which served as the basis for the failure of his pediatrics rotation. Mahaffey explained .the coding system he used was the system used by William Carey, .which only had around a hundred or so codes identifying medical procedures as opposed to the 10,000 codes used by Dr. Chard at South Central Regional Medical Center for procedures. Mahaffey’s account of the logs directly opposed the position taken by William Carey that, his logs were intentionally falsified.
¶ 54. When viewing the evidence in the. light most favorable to Mahaffey, summary judgment should not have been granted in favor of William Carey. Where doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits. Ellis v. Powe, 645 So.2d 947, 950 (Miss.1994). Accordingly, I would find that there are genuine.issues of material fact that preclude the grant of summary judgment.
II. Whether the chancellor reviewed the decision to dismiss Mahaffey using the appropriate standard.
¶ 55. William Carey is a private institution. The distinction between a public university and a private institution is crucial. Beauchene v. Miss. Coll., 986 F.Supp.2d 755, 767 (S.D.Miss.2013). Policies and procedures of public universities regarding forms of academic dishonesty must comport with due-process requirements of the Fourteenth Amendment because a student’s continued enrollment is deemed, a protected property right. Id. However, these same protections are not available to *856 students enrolled in private colleges and universities. Id. As such, “causes of actions against private colleges are usually limited to only breach of contract claims.” Id. at 768.
¶ 56. The district court in Beauchene summarized the discretion afforded to institutions when addressing dismissals based on academics as opposed to disciplinary dismissals.
When reviewing dismissals that are academic in nature (such as plagiarism), as opposed to disciplinary dismissals, academic institutions are given even more discretion. See Hughes, 765 So.2d at 534 (“A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story.... In contrast, an academic dismissal calls for far less stringent procedural requirements.” (citations omitted)); Salcido v. Univ. of S. Miss., 2:11cv173, 2013 WL 2367877, at *4 n. 2 (S.D.Miss. May 29, 2013) (university faculties must have the widest range of discretion in making judgment as to the academic performance of students and them entitlement to promotion or graduation because a graduate or professional school is the best judge of its students’ academic performance and their ability to master the required curriculum).
Beauchene, 986 F.Supp.2d at 768.
¶ 57. “Misconduct and failure to attain a standard of scholarship cannot be equated.” Id. at 768-69 (quoting Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir.1976)).
To be clear, a student dismissed for academic reasons is not entitled to any type of due process hearing, and all that is required for disciplinary actions is an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context.
Id. at 769 (citations and quotation marks omitted).
¶ 58. Unlike the less stringent procedural requirements of an academic dismissal, different protections exist for disciplinary expulsions. Hughes, 765 So.2d at 540 (¶41). “A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story.” Id. (citing Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). The dismissal in Beauchene was based on academic misconduct, but Mahaffey’s dismissal was based solely on professional misconduct according to William Carey. Although the trial court classified the dismissal as a mixed basis of disciplinary and academic grounds, the final dismissal letter omitted the previously cited academic ground. The final dismissal letter limited the basis of Mahaf-fey’s dismissal to “disciplinary issues” based on a “pattern of unprofessional behavior.”
¶ 59. I would find that the trial court incorrectly used the more deferential standard applicable to academic dismissals when evaluating Mahaffey’s dismissal. Because William Carey explicitly removed the academic portion of the grounds for dismissal, I cannot say the “informal give and take” was sufficient in this case. The informal give and take exhibited in Beau-chene was not provided to Mahaffey. Beauchene involved a student dismissed based on plagiarism on two separate occasions. Beauchene, 986 F.Supp.2d at 762. The student was given multiple opportunities to explain the plagiarism, and he eventually confessed to his wrongdoing. Id. at 772. To the contrary, Mahaffey offered *857 explanations for his alleged professional misconduct. Thus, a full trial on the merits is necessary in this case to resolve these disputed facts.
III. Whether the procedures were carried out with fundamental fairness so as to ensure that the decision to dismiss Mahaffey was not arbitrary and capricious.
¶ 60. It must be determined whether William Carey’s procedures were carried out with fundamental fairness so as to ensure that the decisions rendered were not arbitrary and capricious. Id. at 769 (citing Hughes, 765 So.2d at 535). Moreover, “[i]n balancing the Court’s interest in safeguarding students from unfair procedures that result in arbitrary or capricious decisions, with the importance of giving judicial deference to an academic institution’s decision-making process, the Court may look to the degree in which [the institution] deviated from its established procedures and whether there was substantial evidence to support its decisions.” Id. (citations omitted).
¶ 61. On February 16, 2012, Dean Lo-vins sent a letter to Mahaffey informing him that he had been placed on “probation with conditions” based on conduct and specifically excluded academics as á basis. The letter set out four conditions of probation and stated that the “[f|ailure to comply with any of these conditions will result in referral to the Committee for further discussion and recommendations.”- The conditions placed on Mahaffey were as follows: (1) that he see a professional counselor to address recognizing appropriate lines of authority and working within the medical team environment; (2) that only Dr. Turner would dictate all rotations for him; (3) that he address any concerns regarding any outside entity and his education at the COM with Dr. Turner; and (4) that he meet with Dr. Weir monthly until August 2012 and thereafter with Dr. Turner.
¶ 62. On April 17, 2013, the Committee voted unanimously to recommend that Ma-haffey be dismissed for unprofessional conduct as well as for failing the pediatrics rotation. The minutes noted: “After multiple instances of unprofessional conduct, and an F in his rotation, Jacob Mahaffey should be dismissed.” The minutes of the meeting erroneously noted that Mahaffey had failed twice. The Committee concluded that Mahaffey had “outright falsified his clinical logs.”
¶ 63. Oh May 13, 2013, Dr. Porter forwarded the Committee’s recommendation, including an affidavit from Dr. Chard addressing the log discrepancies to Dr. Turner. On May 16, 2013, Dean Turner sent Mahaffey a letter notifying him of his dismissal from the COM based on “repeated acts of unprofessional behavio'r, and failure of the Pediatrics Rotation.” The letter stated that he “failed to meet the requirements of ... probation,” and that the decision “cannot be appealed.” The letter referred to the dismissal procedure “in the appropriate sections of the student handbook for 2012-2013.” However, on May 23, 2013, Dean Turner sent a second letter to Mahaffey stating that the “dismissal can be appealed in accordance with the appropriate sections of the Student Handbook for 2012-2Q13 within 10 days[.]” If he decided to appeal, Mahaffey was urged to consult with the associate dean for clinical affairs, Dr. Beth Longenecker, so she could inform him of the circumstances related to his clinical rotations, which led to their decision.
¶ 64. Mahaffey appealed the decision to Dr. Turner. A hearing was held in front of Dr. Tuner and the -Committee on June 25, 2013. Mahaffey appeared, addressed the Committee orally, and answered ques *858 tions. However, Mahaffey was not given an opportunity to present testimony of witnesses at the hearing. On July 1, 2013, the dean sent Mahaffey a letter notifying him that he had denied his appeal and upheld the Committee’s dismissal recommendation, but stated that the dismissal was based on “disciplinary issues.” The letter provided that “[ajfter due consideration and weighing all the issue[s] I find a pattern of unprofessional behavior that, is not consistent with that expected of a graduate!.]” , .
¶ 65. Mahaffey was allowed to appeal the decision to the president ’of William Carey University, which he did.- He was not allowed to be present at the appeal. Again, Mahaffey was not allowed to present testimony of witnesses at this appeal. The president, Tommy King, sent a letter to Mahaffey stating , that “after hearing your appeal and reviewing all information provided by you and the [COM], I do not find egregious errors on the part of the Committee nor the dean of the [COM] that would warrant overturning their decision.” The letter concluded that the decision of the Committee would stand.
¶ 66. There is an implied contractual relationship between a university and its students. Hughes, 765 So.2d at 535 (¶ 23). The chancellor determined that William Carey could deviate from the student handbook as long as there was informal give and take between the student and the university. I disagree. “[T]he student-university relationship is contractual in nature!,] and ... the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy.” Id. at 534 (¶ 20). Based on the record before, us, I would find that William Carey deviated from its handbook. William Carey deviated from its own procedures by first not allowing an appeal, citing the student handbook as authority. Days later, William Carey changed its position and informed Mahaffey that.he was entitled to an appeal,. again citing the same student handbook. William Carey also changed its position on the grounds for Mahaeffeyis- dismissal. Initially, Mahaf-fey’s dismissal was based on disciplinary and academic grounds. However, William Carey ultimately characterized his' dismissal as based solely on disciplinary grounds.
¶ 67. Due to William Carey’s changes in its position as to its appeal process and grounds for dismissal, I cannot say that the decisions were not arbitrary and capricious. It does not appear based on the record before us that the decisions of William Carey were carried out with fundamental fairness in'light of the email from Dean Turner on December 23, 2011, stating, “I think it is time for Jacob to go home.” Also, it does not appear fundamentally fair that Mahaffey was not allowed to be present at the final appeal to the president, undoubtedly the most important appeal. The circumstances surrounding this dismissal decision should be given the benefit of a full trial on the merits to determine whether or not Mahaf-fey was afforded fundamental fairness.
¶ 68. William .Carey contends that a clause in the handbook disclaims any contractual relationship created by the handbook. I find ■ that this self-serving disclaimer was not binding on Mahaffey. This argument is at odds with the holding of Hughes, which found that the terms of a student-university relationship may be derived from a student handbook. Here, William Carey deviated from its policy in not allowing Mahaffey to retake his pediatrics rotations after receiving a failing grade. It was the policy to allow a student to retake a course with a failing grade, while, dismissal was recommended after failing three or more times. I would find that William Carey’s deviations, based on *859 the record before us, should have at least precluded summary judgment.
IV. Whether judicial estoppel applies.
¶ 69. William Carey argues that Mahaf-fey should be judicially estopped from arguing against the grant of summary judgment in favor of William Carey because he filed a cross-motion for summary judg: ment. I disagree.
¶ 70. “Because of judicial "estoppel, a party cannot assume a position at óne stage of a proceeding and then take a contrary stand' later in the same litigation.” Pursue Energy Corp. v. Miss. State Tax Comm’n, 968 So.2d 368, 377 (¶ 19) (Miss.2007): Here, Mahaffey’s position has consistently been that there was a breach of an implied contract because William Carey deviated from its standard procedures and handbook, and did' not act with fundamental fairness in dismissing him. I do not find that Mahaffey’s position in his cross-motion for summary judgment is inconsistent or “at odds” with his current position taken on appeal. See In re Estate of McLemore, 63 So.3d 468, 491 (¶ 71) (Miss.2011). Thus, William Carey’s argument is without merit.
" CONCLUSION
¶ 71. For these reasons, I would reverse summary judgment granted in favor of William Carey and remand the case for further proceedings..